E-FILED
Wednesday, 11 November, 2020  04:44:56 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

|  |  |
|---|---|
| UNITED WISCONSIN GRAIN PRODUCERS LLC; DIDION ETHANOL, LLC; ACE ETHANOL, LLC; FOX RIVER VALLEY ETHANOL, LLC; BADGER STATE ETHANOL, LLC; and PLCP, LLLP,<br><br>Plaintiffs,<br><br>v.<br><br>ARCHER DANIELS MIDLAND COMPANY,<br><br>Defendant. | Civil Action No.:<br><br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

## **TABLE OF CONTENTS**

GLOSSARY OF COMMONLY USED TERMS ..................................................................... ii

SUMMARY OF CASE ........................................................................................................ 1

PARTIES ............................................................................................................................. 8

JURISDICTION AND VENUE ........................................................................................... 9

FACTUAL ALLEGATIONS .............................................................................................. 10

    A.    The Ethanol Market in the United States ................................................. 10

    B.    The Argo Terminal and the Chicago Price Indexes .................................. 14

    C.    Ethanol Derivatives Are Tied to the Chicago Benchmark Price .............. 16

    D.    The Chicago Benchmark Price and Chicago Ethanol Derivatives are
        highly susceptible to manipulation ......................................................... 19

    E.    The Mechanics of ADM's Scheme ........................................................... 23

    F.    ADM's Conduct Was Intended to Control and Manipulation Prices ....... 26

    G.    ADM's Senior Executive Knew About the Unlawful Scheme ................. 32

    H.    The Impact of ADM's Scheme on Ethanol Prices .................................. 35

FRAUDULENT CONCEALMENT ..................................................................................... 36

RELEVANT MARKETS ..................................................................................................... 37

    A.    ADM Exercised Monopoly Power in the Argo Terminal Market, Thereby
        Controlling and Depressing Prices in the U.S. Ethanol Market .............. 37

    B.    ADM Possessed Monopoly Power in the Argo Terminal Market and
        the U.S. Ethanol Market ........................................................................... 40

    C.    ADM's Monopoly Power Was Durable. .................................................. 41

VIOLATIONS ALLEGED ................................................................................................... 43

PRAYER FOR RELIEF ....................................................................................................... 56

JURY TRIAL DEMANDED ................................................................................................ 58

## GLOSSARY OF COMMONLY USED TERMS

**Argo Prices:** Prices of ethanol for transactions in ethanol made at the Argo Terminal. Argo Prices play an outsized role in setting of U.S. ethanol prices. Argo Prices during the Market-on-Close Window (defined below) are used by Platts (defined below) in the determination of the Chicago Benchmark Price. Argo Prices are also used by OPIS (defined below) in its reports of the daily Chicago OPIS prices.

**Argo Terminal**: A fuel terminal located in Argo, Illinois operated by Kinder Morgan. Because of its Midwest location, the Argo Terminal plays an outsized role in the buying and selling of ethanol. Ethanol trading at the Argo Terminal during the half-hour Market-on-Close Window (defined below) determines the Chicago Benchmark Price (defined below) that is used to set the price for ethanol and ethanol-based financial instruments sold throughout the United States.

**Argo Terminal Market**: The market for the purchase and sale of ethanol at the Argo Terminal. The Argo Terminal Market is unique because Argo Prices for ethanol determine the price of ethanol sold nationwide whether it is sold at other terminals or through bilateral sales between private parties through negotiated agreements.

**Chicago Benchmark Price**: A benchmark price index for ethanol published by Platts. The Chicago Benchmark Price and the Chicago OPIS Price (defined below) are the dominant indexes used to determine the price in Producer Sales Contracts for ethanol sold throughout the United States. However, the Chicago Benchmark Price is the exclusive index used as the basis for determining the value of Chicago Ethanol Derivatives. The Chicago Benchmark Price is set by reference to the daily price of ethanol traded at the Argo Terminal. More particularly, the Chicago Benchmark Price is determined by Platts based on ethanol sales made during the Market-on-Close Window at the Argo Terminal.

**Chicago Ethanol Derivatives**: Ethanol futures contracts and options contracts traded on the Chicago Mercantile Exchange (the "CME"). The value of these instruments is determined wholly or in part by the Chicago Benchmark Price. The most important derivatives are (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on the New York Mercantile Exchange ("NYMEX"); (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on the Chicago Board of Trade ("CBOT").

**Chicago OPIS Price:** A benchmark price index published by OPIS that is frequently used as the basis for setting the price of ethanol sold throughout the United States. The Chicago OPIS Price is set by reference to the daily price assessments released by OPIS for ethanol spot market trades at the Argo Terminal. Specifically, assessments are for Denatured fuel-grade ethanol FOB Argo Terminal, 5,000 bbl, including RINs for the calendar year corresponding to the product delivery date. Prompt assessments are 3-10 days from the published date.

**Decay**: The phenomenon that occurs where a fixed percentage of the open position in a diminishing balance contract held by an investor is "locked in" based on each day's trading price. The amount of decay can be determined by the number of open positions held by an investor

divided by the number of trading days in the particular month. This decay occurs because each trading day's settlement price has a proportional impact on the final settlement value of the contract at the end of the month.

**Diminishing Balance Contract**: Specific futures contracts whose front month position in any given contract month diminishes as the contract month progresses toward expiration at the end of the month for purposes of position limits. Diminishing balance contracts typically have a final settlement value equal to the average of the benchmark price for all trading days in the contract month. Chicago Ethanol (Platts) Futures are diminishing balance contracts.

**Formula Prices:**  In their Producer Sales Contracts, Producers frequently specify, as the price term, a formula which is expressly based on Argo Prices.  As used herein, Formula Prices are prices in Producer Sales Contracts which are expressly based, in whole or in part, on a Chicago Benchmark Price and/or a Chicago OPIS Price.

**Hitting the Bid**: A phrase that describes a consummated trade where a seller agrees to match a buyer's posted bid quotation price. "Hitting the bid" is the opposite of "lifting the offer," where a buyer agrees to match a seller's offer quotation for the product.

**ITT**: Intertank Transfer ("ITT") transactions occurring at the Argo Terminal where ethanol is sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale. ITT transactions occurring during the MOC Window form the basis of the Chicago Benchmark Price.

**Lifting the Offer**: A phrase that describes a consummated trade where a buyer agrees to match a seller's offer quotation for the product.  "Lifting the offer" is the opposite of "hitting the bid," where a seller agrees to match a buyer's posted bid quotation price.

**Long Position**: A trading position where a derivative investment earns money for a trader if the price of the underlying commodity increases. A long position contrasts with, and is complementary to, a short position where a trader earns money if the price of the underlying commodity decreases.

**Market-on-Close Window**: The Market-on-Close ("MOC") Window is a 30-minute trading period for ITT ethanol transactions between 1:00 p.m. and 1:30 p.m. C.T. every trading day at the Argo Terminal. Platts uses trading activity during the MOC Window to determine the daily Chicago Benchmark Price for ethanol.

**Oil Price Information Service ("OPIS"):** OPIS provides prices from the Argo Terminal in its Chicago OPIS Prices.

**Platts**: S&P Global Platts ("Platts") is a provider of trading information in the ethanol market and other markets. Platts creates the daily Chicago Benchmark Price that is then used to set Formula Prices for sales of ethanol and is used to determine the value of Chicago Ethanol Derivatives.

**Producer Sales:**  The sales of ethanol made by the producer of that ethanol to another person.

**<u>Producer Sales Contracts</u>:**  Contracts used by ethanol producers to sell the ethanol they produce. Producer Sales Contracts usually incorporate Formula Prices.

**<u>Producers</u>:**  The persons who produce ethanol and sell such ethanol to another person.

**<u>Relevant Time Period</u>**: The period during which Defendant ADM illegally manipulated Argo Prices. The Relevant Time Period runs from November 17, 2017 to the present.

**<u>Short Position</u>**: A trading position where a derivative investment earns money for a trader if the price of the underlying commodity decreases. A Short Position contrasts with and is complementary to a Long Position where a trader earns money if the price of the underlying commodity increases.

**<u>U.S. Ethanol Market</u>**: The market for ethanol sold throughout the United States.  The pricing in the U.S. Ethanol Market is dictated by the prices set in Argo Terminal Market.

Plaintiffs United Wisconsin Grain Producers LLC, Didion Ethanol, LLC, ACE Ethanol, LLC, Badger State Ethanol, LLC, Fox River Valley Ethanol, LLC, and PLCP, LLLP, (collectively, "Plaintiffs") bring this action against Defendant Archer Daniels Midland Company ("ADM").  Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiffs specifically allege:

## SUMMARY OF CASE

1.      Ethanol (ethyl alcohol) is a renewable, biodegradable, high-octane motor fuel derived from the sugars, starches and cellulosic matter found in corn. It has been used as a fuel or additive dating back to the days of Henry Ford's Model T.  Nearly every gallon of gasoline consumed in the United States today contains fuel ethanol. Ethanol is part of our nation's solution to reducing our dependency on fossil fuels, lowering fuel prices, creating domestic jobs, boosting the farm economy, and cleaning our environment.

2.      Plaintiffs are producers and sellers of ethanol in the Midwest and the United States. Unlike the large agribusiness that is ADM, Plaintiffs are limited liability companies and a limited partnership comprised of largely local and regional corn farmers.  They do not have the power to control the ethanol market nor do they have the power to change the way that ethanol is priced. Plaintiffs sell the ethanol they produce for the prevailing market prices established, for the most part, by reference to the prices set at the Argo Terminal.  More particularly, Plaintiffs, like most Producers, sell their ethanol by way of Producer Sales Contracts that include Formula Prices which are set by reference to the two dominant pricing indexes used throughout the United States, the Chicago Benchmark Price and/or the Chicago OPIS Price (referred to collectively herein as the "Chicago Price Indexes").  Buyers and sellers in the ethanol market rely heavily on the proper

functioning of the Argo Terminal Market and accept the Chicago Price Indexes as an accurate measure of the market price for ethanol.

3.      ADM, one of the largest producers of ethanol in the United States, intentionally manipulated and artificially depressed the price of ethanol in the United States.  By targeting ethanol sales activity at the Argo Terminal and specifically during the key time frame, the MOC Window, ADM was able to artificially depress the Chicago Price Indexes and, in turn, control the prices of ethanol sold throughout the United States that relied upon those indexes.  ADM was able to profit from its ability to control and depress the price for ethanol because, in addition to setting the market price for ethanol in the United States, the Chicago Benchmark Price is also used by buyers and sellers to determine the value of Chicago Ethanol Derivatives.  So, while ADM was depressing Argo Prices and the Chicago Price Indexes, ADM was simultaneously making outsized investments in Short Position Chicago Ethanol Derivatives which meant that although it lost money on its ethanol sales by selling at reduced prices, it more than made up that lost revenue because its "speculative" derivatives were guaranteed to increase in value as a result the depressed ethanol prices it created.  In addition, by driving down ethanol prices, ADM intended to drive competitors like Plaintiffs out of the ethanol market, further entrenching its control over the pricing of ethanol nationwide.

4.      As a result of ADM's unlawful, anticompetitive and deceptive activity, Plaintiffs were harmed.  This lawsuit seeks redress under Federal antitrust law, Illinois antitrust law, and the consumer protection laws of the States of Illinois, Iowa, and Wisconsin, for damages caused by ADM's illegal manipulation of Argo Prices, including the Chicago Price Indexes, that resulted in depressed prices on nearly all Producer Sales nationwide.

5.     By way of further explanation, ADM produces ethanol at multiple bioprocessing sites in the United States and sells ethanol into cash markets, including a cash spot market at the Argo Terminal. While being one of many cash spot markets, the Argo Terminal is unique because it serves as the price reference point for nearly all ethanol sales in the United States.  Specifically, ethanol sales at the Argo Terminal are used to set the Chicago Price Indexes, the indexes that are then used to set the price for ethanol sold throughout the United States.  The Chicago OPIS Price index is set by reference to the price of ethanol sold each day at the Argo Terminal and the Chicago Benchmark Price is set by reference to the price of ethanol sold each day at the Argo Terminal during one thirty minute-trading period, the MOC Window.

6.     As a producer and seller of ethanol, ADM should want pricing mechanisms that maximize ethanol market prices.  However, by 2017, ADM had decided its ethanol operations were not profitable.  First, AMD sought to sell its ethanol production facilities, but it failed to secure a willing buyer.  ADM then devised a novel (and illegal) way to profit from its ethanol operations.  During the Relevant Time Period, ADM acquired large amounts of Short Position Chicago Ethanol Derivatives that went up in value if the Chicago Benchmark Price for ethanol went down.  ADM acquired these Chicago Ethanol Derivatives to an extent that went well beyond any reasonable hedging activity and was a stark departure from its past practice.  The key to profiting from this outsized financial derivative position was ADM's ability to control the price of ethanol and specifically its ability to make sure that the Chicago Benchmark Price was depressed.

7.     ADM specifically sought to exercise, acquire and/or maintain monopoly power in the Argo Terminal Market so that it could depress Argo Prices generally, and, more particularly, so that it could depress prices during the MOC Window when the Chicago Benchmark Price was set.  By depressing the Chicago Benchmark Price, ADM's Short Position Chicago Ethanol

3

Derivatives would earn supra-competitive profits. In effect, ADM engaged in cross-market manipulation: by monopolizing ethanol sold at the Argo Terminal, ADM was able to manipulate and drive down the Chicago Benchmark Price that had the effect of driving up the value of its Chicago Ethanol Derivatives to an extent that more than offset its losses on those ethanol sales. However, by driving down Argo Prices, ADM drove down the Chicago Price Indexes which then drove down prices throughout the U.S. Ethanol Market.  By acquiring and maintaining the ability to control prices at the Argo Terminal, ADM acquired and maintained the ability to control the price of ethanol throughout the U.S. Ethanol Market and by using that power to depress Argo Prices, ADM artificially depressed ethanol prices through the United States.

8.       To succeed, ADM needed to execute a two-step strategy. First, ADM needed to ensure that prices of ethanol sold at the Argo Terminal would decline (*i.e.*, ADM needed to depress Argo Prices), which ADM did by: (i) flooding the Argo Terminal with ethanol; and (ii) hurriedly lowering offers or accepting low priced bids as the dominant Argo Terminal seller rather than asking or waiting for a higher price.  ADM intended to control all pricing in the Argo Terminal Market, but it focused in particular on ethanol sales during the MOC Window used to set the Chicago Benchmark Price because the Chicago Benchmark Price is used to determine the value of Chicago Ethanol Derivatives.  By seeking to control the price of ethanol in the Argo Terminal Market, ADM was seeking to control the price of ethanol nationwide because of the Argo Terminal Market's unique role in price setting for the U.S. Ethanol Market.  Accordingly, because United States ethanol prices are set by reference to Argo Prices (using the Chicago Price Indexes), by selling on average, as little of one million gallons of ethanol daily during the MOC Window at the Argo Terminal, ADM was able to adversely manipulate the price for over 32 million gallons of ethanol sold throughout the United States each day.

4

9.     Second, ADM needed to gain enough leverage to turn its own losses on the sale of ethanol at the Argo Terminal (and associated losses on its plant production), into financial gains at the New York Mercantile Exchange ("NYMEX") and the Chicago Board of Trade ("CBOT") that more than offset its losses, which it did by acquiring Short Position Chicago Ethanol Derivatives at an unprecedented scale.

10.    There can be no doubt that ADM's conduct at the Argo Terminal, and in the MOC Window, had unlawful and anticompetitive intent.  Starting November 17, 2017, when ADM began executing its price manipulation strategy, through at least mid-2019, ADM was a buyer in the MOC Window only once, for 210,000 gallons, and was a seller at all other times, accounting for a total of approximately 821 million gallons sold.  This stood in stark contrast to its pre-November 17, 2017 trading behavior in which ADM had consistently been a buyer during the MOC Window.  Even more incriminating, while selling in the MOC Window, ADM was, at times, simultaneously purchasing ethanol at the Argo Terminal *outside* of the MOC Window when necessary to meet its delivery obligations at prices above which it was selling ethanol *within* the MOC Window.  In the absence of ADM's unlawful scheme, this conduct was against its own economic interest.

11.    ADM used its size and proximity to Argo to exploit and overwhelm the Argo Terminal and force its desired, self-serving depressed ethanol pricing outcome upon other financial and physical market participants. ADM knew that its conduct would also have impact beyond driving up its own profits.  ADM knew its conduct would cause substantial harm to other ethanol producers, including Plaintiffs, by reducing the prices they received on their ethanol sales.  In addition, not only did ADM's control of Argo Prices have immediate negative effects on ethanol producers, it also threatened to have long term negative effects on the U.S. Ethanol Market by

5

creating a market distortion.  ADM knew that other Producers would be forced to sell their ethanol at artificially low prices which would ultimately lead to those Producers being forced to reduce their capacity and/or leave the market altogether, further entrenching ADM's dominant position. And, once the Producers reduced capacity or left the market, it would be difficult and/or expensive to reenter when prices rebounded because of the nature of ethanol plant operations.  ADM kept other market participants in the dark about its strategy.  However, even when market participants began to suspect what ADM was doing, they were powerless to stop its illicit behavior but instead were forced to continue to sell their ethanol at artificially depressed prices.

12.     Much of ADM's behavior was economically irrational and contrary to its self-interest as an ethanol producer – unless it was intended to manipulate ethanol prices in order to benefit ADM's oversized investments in Short Position Chicago Ethanol Derivatives and force Plaintiffs to reduce their capacity and/or even leave the ethanol market altogether.  Thus, the only reasonable conclusion to draw from the evidence is that ADM in fact engaged in precisely this kind of manipulation. The highlights of some of the key evidence are as follows:

- Before November 17, 2017, when ethanol prices and profit margins were higher, ADM was one of the largest buyers of ethanol at the Argo Terminal. However, starting November 17, 2017 and continuing thereafter, when ethanol prices were lower and profit margins were eroding or non-existent, ADM became the largest seller of ethanol in the Argo Terminal Market – accounting for roughly 70% of all ethanol sales there.

- Before November 17, 2017, ADM was one the largest buyers of ethanol at the Argo Terminal Market during the MOC Window. However, starting in November 17, 2017 and continuing thereafter, ADM changed its behavior becoming by far the largest seller of ethanol during the MOC Window – accounting for roughly 90% of all such sales, and sometimes even more.

- Starting on or about November 17, 2017 and continuing thereafter, ADM frequently sold more ethanol at low prices than it could deliver to the Argo Terminal Market, including during the MOC Window. To satisfy its obligations for those sales, ADM bought ethanol at the end of trading months, sometimes even at higher prices than it had sold ethanol for earlier in the month. However, even here ADM took steps to

maximize its price manipulation.  ADM made sure to never buy ethanol during the MOC Window, where its purchases would be more likely to raise the Chicago Benchmark Price and thereby negatively impact ADM's Short Position Ethanol Derivatives.

- Starting shortly before November 17, 2017 and continuing thereafter, ADM amassed huge positions in ethanol derivatives tied to prices at the Argo Terminal. The size of these positions represented a dramatic departure from ADM's previous hedging activities and can be described only as speculative bets. In some months, ADM took short positions on up to 6,000-7,000 Chicago Ethanol (Platts) Futures contracts, representing 252 to 294 million gallons of ethanol and 50% or more of the open interest in the relevant contract months. These speculative short positions dwarfed ADM's total monthly ethanol production capacity of roughly 133 million gallons.

- Due to the sheer size of ADM's derivative positions and the way that they "decayed" over the course of a relevant "spot" month – as will be explained later – ADM was strongly incentivized to manipulate the Chicago Benchmark Price downward during the MOC Window of every trading day within a month.

13.    ADM's unlawful conduct and resulting manipulation of the derivative contracts market is illegal and is forbidden by the Commodities Exchange Act ("CEA").  Moreover, as discussed above, it created a market distortion, manipulating ethanol supply and demand at the Argo Terminal to depress Argo Prices and reducing prices for the entire U.S. Ethanol Market.  As noted, the Argo Terminal is a critical point for ethanol price determination and although many Producer Sales are made outside of the Argo Terminal, the overwhelming majority of Producer Sales are made through Producer Contracts that include Formula Prices based on the Chicago Price Indexes.  Thus, as ADM knew with substantial certainty when it developed and executed its illegal strategy, its downward manipulation of prices at the Argo Terminal distorted the proper functioning of the Argo Terminal Market and the U.S. Ethanol Market, harming other market participants who relied upon the proper functioning of the Chicago Price Indexes, thwarting the proper operation of the Producer Sales Contracts, and interfering with the business relationships of the large majority of Producers, including Plaintiffs.

**PARTIES**

14.     Plaintiff United Wisconsin Grain Producers LLC ("UWGP"), is a limited liability company, organized under the laws of the State of Wisconsin with its principal place of business in Friesland, Wisconsin.  UWGP is an ethanol producer that sells that ethanol to others primarily pursuant to Producer Sales Contracts.

15.     Plaintiff Didion Ethanol, LLC. ("Didion") is a limited liability company, organized under the laws of the laws of the State of Wisconsin with its principal place of business in Cambia, Wisconsin.  Didion is an ethanol producer that sells that ethanol to others primarily pursuant to Producer Sales Contracts.

16.     Plaintiff ACE Ethanol LLC ("ACE") is a limited liability company, organized under the laws of the State of Wisconsin with its principal place of business in Stanley, Wisconsin. ACE is an ethanol producer that sells that ethanol to others primarily pursuant to Producer Sales Contracts.

17.     Plaintiff Badger State Ethanol, LLC ("Badger State") is a limited liability company, organized under the laws of the State of Wisconsin with its principal place of business in Monroe, Wisconsin.  Badger State is an ethanol producer that sells that ethanol to others primarily pursuant to Producer Sales Contracts.

18.     Plaintiff Fox River Valley Ethanol, LLC ("Fox River") is a limited liability company, organized under the laws of the State of Wisconsin with its principal place of business in Oshkosh, Wisconsin.  Fox River is an ethanol producer that sells that ethanol to others primarily pursuant to Producer Sales Contracts.

19.     Plaintiffs UWGP, Didion, ACE, Badger State and Fox River are referred to collectively herein as the "Wisconsin Plaintiffs."

20.     Plaintiff PLCP, LLLP ("Pine Lake Corn") is a limited liability limited partnership, organized under the laws of the State of Iowa with its principal place of business in Steamboat Rock, Iowa.  Pine Lake Corn is an ethanol producer that sells that ethanol to others primarily pursuant to Producer Sales Contracts.

21.     Defendant Archer Daniels Midland Company ("ADM") is a corporation organized, created, and existing pursuant to the laws of the state of Delaware with its North American headquarters at 4666 Faries Parkway, Decatur, Illinois 62526 and its global headquarters at 77 West Wacker Drive, Chicago, Illinois 60601.  Upon information and belief, all of ADM's ethanol trading operations, including its trading in Chicago Ethanol Derivatives, was directed from its North American headquarters in Decatur, Illinois.

## JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over the Plaintiffs' federal antitrust claims, brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, pursuant to 28 U.S.C. §§ 1331 & 1337.  The Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

23.     The Court has personal jurisdiction over the Defendant because ADM has its North American headquarters in this District; (2) ADM has its global headquarters in the State of Illinois; (3) ADM transacted business in the State of Illinois, including in this District, during the Relevant Time Period; (4) ADM had substantial contacts with the State of Illinois, including in this District, during the Relevant Time Period; and (5) the claims brought in this lawsuit arise out of actions taken by ADM in the State of Illinois, including actions taken in this District.

24.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d). Defendant ADM resides, transacts business, and has agents in this District; the claims brought in this lawsuit

arise out of events or omissions that occurred in this District; and a substantial portion of the affected interstate trade and commerce described herein occurred in this District.

25.    The activities of ADM were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States, including the Argo Terminal Market, the U.S. Ethanol Market, and the market for financial derivatives based on ethanol.

26.    Filing this case in the Urbana Division of the Central District of Illinois is proper because ADM's manipulative activities were conceived of and directed from its North American headquarters in Decatur, Illinois, which is within Macon County, Illinois and part of the Urbana Division per Local Rule 40.1.

## FACTUAL ALLEGATIONS

### A.    The Ethanol Market in the United States.

27.    Ethanol is a clear, colorless simple alcohol.  Plaintiffs and ADM produce ethanol primarily from corn and sell it for use as a renewable fuel and additive.  Ethanol is a unique commodity product.

28.    The current domestic ethanol market was largely created by federal law and state regulations that set renewable fuel requirements for transportation fuel. In particular, the Renewable Fuel Standard originated with the Energy Policy Act of 2005 which increased the volume of renewable fuel that must be blended into gasoline. The Renewable Fuel Standard was expanded and extended by the Energy Independence and Security Act of 2007.

29.    Renewable Fuel Standards require gasoline producers to buy a certain quantity of renewable fuels (such as ethanol) each year to blend into gasoline used as transportation fuel. Ethanol is the renewable fuel most used by obligated parties to meet this renewable fuel requirement. Legal and regulatory requirements play a large role in the demand for ethanol by

creating a class of "ethanol consumers" consisting mostly of refineries, importers, blenders, and general gasoline resellers.

30.     Buyers in the ethanol market get their ethanol primarily in two ways. First, they can buy ethanol directly from an ethanol producer, contracting to have the Producer ship ethanol straight to the buyer's facilities for blending with gasoline that is then shipped to retail markets. Second, they can choose to buy ethanol at terminals located throughout the country, where Producers ship and store large quantities of ethanol via railcar, tanker truck, or barge. Ethanol stored at terminals is available for immediate or "spot" sale to buyers. At these terminals, ethanol and gasoline can also be blended onsite for ease of shipment to retail end users; alternatively, buyers can transport the ethanol purchased at terminals back to their own facilities or refineries for blending.

31.     Terminals also serve as locations where other buyers who do not blend ethanol for end-use can acquire and ship it for resale elsewhere at higher prices. By doing so, such middlemen and resellers can benefit from market arbitrage.

32.     Below is a diagram showing the general flow of ethanol production and distribution in the United States with the "Fuel Terminal" at the point of the distribution chain where ethanol offered for sale by ethanol producers is matched up with buyers who blend it with gasoline from refiners and importers:



Source: Alternative Fuels Data Ctr., U.S. Dep't of Energy, Ethanol Production & Distribution, https://afdc.energy.gov/fuels/ethanol_production.html (last visited October 30, 2020).

33.     The Midwest is the epicenter of ethanol production in the United States, dwarfing every other region. The U.S. Energy Information Administration reports that 176 of the 200 ethanol plants in the United States (88%) are located in the Midwest, in a region defined as Petroleum Administration for Defense District 2, or PADD 2.[1]

---

[1] During World War II, the Petroleum Administration for War agency divided the U.S. into five Petroleum Administration for Defense Districts, or PADDs to help organize the allocation of fuels derived from petroleum products, including gasoline and diesel (or "distillate") fuel.  Although the Petroleum Administration for War agency was abolished in 1946, the five PADDs are still used today by the government and private businesses for data collection purposes.



34.    Ethanol plants in the Midwest also have higher capacity than plants elsewhere in the United States.  As shown in the diagram below, of the country's nearly 16.3-billion-gallon annual production capacity, the Midwest region accounts for more than 14.8 billion gallons (91 percent) of total production. Shipping ethanol out of the Midwest for sale in other regions is therefore a routine part of the ethanol production business.



35.     ADM is one of the country's largest producers of ethanol, operating eight mills in the Midwest and capable of producing a total of 1.69 billion gallons of ethanol, or approximately 10% of the U.S. annual ethanol production of 16 billion gallons.

**B.      The Argo Terminal and the Chicago Price Indexes.**

36.     The Kinder Morgan Argo Terminal in Argo, Illinois is the critical locus in the Midwest for the sale of ethanol, and for setting the indexes used to determine the price for the broader U.S. Ethanol Market.   It is also critical for transporting ethanol domestically and internationally to meet demand. Accordingly, the Argo Terminal is singularly unique because Argo Prices for ethanol determine the prices of ethanol sold at other terminals, as well as the prices that private parties negotiate in non-terminal ethanol sales.

37.     The Argo Terminal is one of the largest of the approximately 1,200 ethanol terminals in the country and, more importantly, it is the largest in the critical PADD 2 region. It can handle shipments by rail, truck, and barge. Because of this multimodal capability and its large 54.6-million-gallon capacity, the Argo Terminal serves all segments of ethanol purchasers, from blenders and other end users to resellers and middlemen.

38.     In recognition of the key role the Argo Terminal plays in the U.S. Ethanol Market, pricing services such as S&P Global Platts ("Platts") and the Oil Price Information Service

("OPIS") provide benchmark price assessments that reflect the trading price of ethanol at the Argo Terminal on a daily basis. Buyers and sellers of ethanol (whether at other terminals or in private negotiated transactions) use these Argo Terminal price assessments to determine what the fair market value of ethanol is at a given time nationwide. Market participants also use Platts and OPIS data to study market trends and predict future movement in ethanol prices for purposes of strategic planning, including hedging and speculation on ethanol derivatives.

39.     One of the most important price assessments compiled by Platts at the Argo Terminal is the Chicago Benchmark Price. The Chicago Benchmark Price is calculated every trading day during the Market-on-Close ("MOC") Window from 1:00 p.m. to 1:30 p.m. C.T. and is based on Intertank Transfer ("ITT") transactions: ethanol sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale.

40.     The price assessment compiled by OPIS at the Argo Terminal is the benchmark Chicago OPIS Price which is calculated every trading day based on ethanol transactions during the full trading day and reflecting transactions for Denatured fuel-grade ethanol FOB Argo Terminal, 5,000 bbl, including RINs for the calendar year corresponding to the product delivery date. Prompt assessments are 3-10 days from the published date.

41.     Throughout the Argo Terminal trading day, ethanol buyers post bid prices and ethanol sellers post offer prices. Under normal trading practices, buyers and sellers adjust their bids and offers in response to the prices proposed by their potential counterparties.  Motivated sellers will decrease their offers to beat the offers of competing sellers, while motivated buyers will increase their bids to beat those of competing buyers.  Once there is a match between a buyer bid and a seller offer, a sale is consummated.

15

42.     When an ethanol seller agrees to sell ethanol at the posted bid price of a buyer, this practice is known as "hitting the bid." The buyer equivalent to hitting the bid is referred to as "lifting the offer," and occurs when an ethanol buyer agrees to pay the posted offer price quoted by an ethanol seller.

43.     This back-and-forth negotiation throughout the trading day (and during the MOC Window) between ethanol buyers and sellers is crucial for price determination at the Argo Terminal and for the calculation of the Chicago Price Indexes. Without it, the Platts and OPIS price assessments would lack a strong, market-based foundation.

**C.     Ethanol Derivatives Are Tied to the Chicago Benchmark Price.**

44.     The Chicago Benchmark Price is also used to establish the value of and to settle several important ethanol derivatives: (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on the New York Mercantile Exchange ("NYMEX"); (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on the Chicago Board of Trade ("CBOT"). The complaint refers to these futures and options contracts collectively as the "Chicago Ethanol Derivatives."

45.     A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail the quality and quantity of the underlying commodity (including the place of delivery if physically settled) and are standardized to be identical for all participants to facilitate trading on futures exchanges such as the CME. Given the standardization of the contract specifications, the only contract variable is price, which is discovered by bidding and offering (also known as quoting) until a trade occurs. The fact that futures contracts are standardized and exchange-traded makes

16

these instruments indispensable as means for hedging by commodity producers such as ADM and for hedging and speculating by consumers, traders, and investors.

46.    A futures contract can be settled in one of two ways. A physically-settled futures contract is settled by physical delivery of the designated quantity of the underlying commodity at a predetermined place on a fixed date (the expiration date) at the predetermined price. A cash-settled futures contract, by contrast, results in a cash payment between the futures contract parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement. The value of a futures contract fluctuates over time until the expiration date, but importantly, the fluctuations in the price of the futures contract is based entirely on the fluctuations in price for the underlying commodity.

47.    An option contract is a type of financial derivative that gives the buyer the right – but not the obligation as with a futures contract – to either buy or to sell a particular commodity at a predetermined price ("strike price"), on or before a specified date in the future (the "expiration date").  The value of an option contract fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity. That value, as well as the decision to exercise the option, depends on whether it is "in-the-money," meaning the strike price is below the current price of the underlying asset; or "out-of-the-money," meaning the strike price is above the current price of the underlying asset. Whether an option is "in or out"-of-the-money depends on the relevant reference price at the time of option settlement – the at-the-money price.

48.    The Chicago Ethanol (Platts) Futures Contract (CME symbol: CU) is the most liquid, or most highly traded, financial derivative tied to the Chicago Benchmark Price. Each Chicago Ethanol (Platts) Futures contract is traded on NYMEX, represents 42,000 gallons (or 1,000 barrels) of ethanol, and is valued as the size (42,000 gallons) multiplied by the floating price

(the Chicago Benchmark Price) quoted in increments of $0.0001, or one-hundredth of a cent, per gallon. The Chicago Ethanol (Platts) Futures Contract has had an average monthly trading volume on the CME in excess of 99,000 contracts between November 2017 and today. The Chicago Ethanol (Platts) Futures contract is cash settled, meaning that the contract parties pay each other based on the difference between the contract price and the settlement price, and there is thus no requirement for physical delivery to satisfy the contract.

49. The CME also offers Chicago Ethanol (Platts) Average Price Options contracts (CME symbol: CVR), which are financially settled, non-early exercisable options of the underlying Chicago Ethanol (Platts) Futures contract, that are traded on NYMEX. Accordingly, the value of Chicago Ethanol (Platts) Average Price Options also corresponds directly to the Chicago Benchmark Price calculated by Platts at the Argo Terminal during the MOC Window. From November 1, 2017 through August 31, 2019, CME reports that total volume in Chicago Ethanol (Platts) Average Price Options was 182,506 contracts.

50. The CME also offers the CME's Ethanol Futures Contract (CME symbol: EH). The EH contract is a physically settled ethanol futures contract listed on CBOT, with each contract representing 29,000 gallons of ethanol to be delivered in the contract month at the price of the contract. While not settled directly to the Chicago Benchmark Price, the market price that EH contracts trade at is heavily influenced by and highly correlated to the Chicago Benchmark Price because traders incorporate changes in the Chicago Benchmark price into their EH contract bid and offer prices, reflecting the Argo Terminal's key role as the largest terminal in the Midwest and more specifically the Argo Terminal MOC Window's key role in setting the price across the United States ethanol market. Thus, ADM's downward manipulation of Argo Prices and the Chicago Benchmark Price would also cause EH contracts to trade at artificially inflated prices. From

18

November 1, 2017 through August 31, 2019, CME reports that total volume in the EH contract was 328,024 contracts.

**D.     The Chicago Benchmark Price and Chicago Ethanol Derivatives are Highly Susceptible to Manipulation.**

51.     ADM recognized four key features of the Chicago Benchmark Price and of Chicago Ethanol Derivatives that made them highly susceptible to manipulation by ADM.

52.     First, both the Chicago Benchmark Price and Chicago Ethanol Derivatives were tied inextricably to trading activity at only one location and market: the Argo Terminal in Argo, Illinois and ADM had five ethanol production facilities within 250 miles of the Argo Terminal. Combined, these facilities had 1.237 billion gallons of total annual ethanol production capacity. Most of these facilities were able to ship ethanol into the Argo Terminal via railcar, barge, and tanker truck. This meant that ADM, compared to its ethanol producer competitors, had a greater ability to attempt to monopolize sales at the Argo Terminal and control pricing by flooding the Argo Terminal market with ethanol offered for sale at artificially lower prices.

53.     Second, the Chicago Benchmark Price (used to determine the price for ethanol sold throughout the United States and used to determine the price for ethanol derivatives) is calculated based on bids, offers, and trades occurring during the MOC Window, a mere half-hour of daily trading at the Argo Terminal. Because of the MOC Window's limited duration and trading volume, ADM could significantly influence the Chicago Benchmark Price downward by concentrating its aggressive pricing and selling into that 30-minute market of the trading day and that is exactly what ADM did.  During the Relevant Period, ADM accounted for over 90% of ethanol sold during the MOC Window.  Moreover, ADM could exert this downward influence on the Chicago Benchmark Price while limiting its worst losses to the comparatively small volume of ethanol trades in the MOC Window. This leverage meant, for example, that by controlling the daily price

for 1 million gallons of ethanol ADM sold at the Argo Terminal during the MOC Window, ADM could manipulate the price for 32 million gallons of ethanol sold daily throughout the United States.

54.     Third, the prices and settlement values of Chicago Ethanol Derivatives are tied to the Chicago Benchmark Price.  Settlement of the Chicago Ethanol (Platts) Future contract (the most actively traded ethanol derivative) is "based on the arithmetic average of the high and low quotations from Platts for [the Chicago Benchmark Price] for each business day that it is determined during the contract month," and the value of Chicago Ethanol (Platts) Average Price Options is, in turn, tied directly to the settlement price of Chicago Ethanol (Platts) Future contracts. Trading prices for the physically settled EH contract are likewise heavily influenced by and highly correlated to the key Chicago Benchmark Price. This meant that ADM's actions during the MOC Window at the Argo Terminal directly influenced the prices and settlement values of Chicago Ethanol Derivatives.

55.     Fourth, unique features of Chicago Ethanol Derivatives allowed ADM to take outsized short positions, while also being able to have an outsized downward influence on the Chicago Benchmark Price with a relatively small number of aggressively priced daily trades of physical ethanol – thus enabling ADM to effectively manage and more than offset the losses associated with those ethanol trades. The unique features of Chicago Ethanol Derivatives also incentivized ADM to manipulate pricing and trading activity during the MOC Window on every trading day during a contract month where ADM had a large short position. For example:

   a.   The settlement format of the Chicago Ethanol (Platts) Futures contract makes it a "diminishing balance contract" under CME Rules 559, 560, and 562, as interpreted by CME Group Advisory RA1711-5 (August 11, 2017).

"Diminishing balance contracts are specific futures contracts whose front month position in any given contract month diminishes as the contract month progresses toward expiration/month end for purposes of position limits. . . . Diminishing balance contracts are typically those where the final settlement price is equal to the arithmetic average of a determined reference price for each business day that it is determined during the contract month . . . ."

b. Up to and including the February 2019 contract, the Chicago Ethanol (Platts) Futures contract had a spot-month position limit of 1,000 (equivalent to 42,000,000 gallons of ethanol). However, this spot-month position limit was only effective at the close of trading three business days prior to the last day of trading of the contract. Until the close of trading three business days prior to the last day of trading of the contract, there was no spot-month position limit – so long as a party was below the 1,000 contract limit by that time, the party could take much larger positions in the contract earlier in the month.

c. For non-diminishing-balance contracts, this would mean that a party taking huge positions early in the spot month would have to unwind/close those positions before the close of trading three business days prior to the last day of that month's contract trading. Taking such a large position carries the risk that potential counterparties will learn of the need to get below a position limit and use that information as leverage to secure a better price for them/worse price for the party holding the large position.

d. In a diminishing balance contract, however, this problem is avoided, as a trader's number of futures positions vis-à-vis the position limit decays by an

21

amount equal to the party's total futures position divided by the number of trading days in that month. This reflects the amount of contracts the party holds that were "locked in" by each day's price, as each trading day's price settlement has that proportional impact on the final settlement value at the end of month.

e.  The diminishing balance nature of the Chicago Ethanol (Platts) Futures contract could be exploited by ADM, allowing it to take short positions in the spot month as large as 6,000 - 7,000 contracts, representing 50% or more of the open interest in the spot month (and 2-3 times ADM's total monthly ethanol production capacity). ADM could then let those large positions decay down below applicable position limits as the month progressed.

f.  Starting with the March 2019 contract, the CME changed the spot-month limit at the close of trading three business days prior to the last day of trading to 500 (equivalent to 21,000,000 gallons of ethanol). CME has not, however, imposed any position limit for earlier in a trading month, leaving ADM free to use the diminishing balance nature of the Chicago Ethanol (Platts) Future contract to amass outsized short positions (albeit less outsized than before the changes) in the spot month and let those positions decay downward below applicable position limits.

56.  The take-away from these features is that ADM could sell a comparatively small amount of ethanol at aggressive prices during the MOC Window in order to drive the Chicago Benchmark Price down[2], while at the same time holding and benefitting from disproportionately

---

[2] Importantly, as noted in Paragraph 53, *supra*, ADM's manipulation of Argo Prices had a profound 1:32 effect on ethanol prices throughout the United States.

larger short positions in Chicago Ethanol Derivatives. The lower prices ADM received for physical ethanol during the MOC Window were almost certain to be exceeded by gains on much larger short derivatives positions, particularly when repeated across all of the MOC Windows within a month. And if market fundamentals outside of ADM's control drove ethanol prices in the spot month upward, ADM could still limit its losses on derivatives shorts via downward manipulation, while at the same time offsetting derivatives losses through higher margins on sales of physical ethanol.

57.     As a more concrete illustration of the math behind ADM's incentive to manipulate, consider the following. The maximum number of ethanol lots ever sold during the daily half-hour MOC Window market was 37 lots of 5,000 barrels of ethanol (on December 1, 2017), or the equivalent of just 185 Chicago Ethanol (Platts) Futures contracts (which each represent 1,000 barrels). During the Relevant Time Period, ADM frequently had short positions in the spot month approaching or exceeding 7,000 Chicago Ethanol (Platts) Futures contracts, the equivalent of 350 contracts per MOC Window day (7,000 contracts / 20 trading days in typical month = 350). So long as ADM's sales in the MOC Window each trading day in the month did not exceed nearly twice the maximum amount of sales that had ever occurred during the MOC Window (and far fewer than 37 lots were sold during most MOC Windows), ADM would profit from manipulation.

**E.     The Mechanics of ADM's Scheme.**

58.     In its simplest form, ADM's scheme consisted of two steps that it repeated over and over each month starting in mid-November 2017. First, ADM placed huge bets in Chicago Ethanol Derivatives in each spot month that the price of ethanol would decrease (a "short position"). Second, during the spot month, ADM drove down the price of ethanol at the Argo Terminal,

focusing in particular on ethanol sold during the MOC Window, to ensure that the Chicago Benchmark Price dropped and that its short bets paid off.

59.    ADM accomplished the downward manipulation of the Chicago Benchmark Price via practices that were contrary to ADM's non-manipulation economic best interest and to MOC Window pricing customs.  For example, at times, rather than acting as a typical seller by engaging in a back-and-forth with Argo ethanol buyers, ADM began "hitting" low bids as soon as MOC Window trading began.  Hitting bids at the opening of the MOC Window (or aggressively hitting the bid in general) has no rational economic basis other than manipulating downward the price of ethanol at the Argo Terminal.

60.    As a seller of ethanol, ADM should have had a primary interest in profit maximizing by selling ethanol at the highest price possible without losing sales to competitors.  By hitting bids immediately or aggressively, ADM gave buyers little opportunity (and no reason) to adjust their bids on ethanol during the MOC Window upward. ADM also undercut offers of competing sellers in the MOC Window by more than was necessary to secure a given sale of ethanol within the MOC Window. As a result, ADM lost money – specifically, the money it would have received for ethanol sales that would have resulted from normal price negotiation.

61.    ADM's practice of aggressively "hitting the bid" and undercutting the current best offer by more than was necessary during the MOC Window can be seen in the daily activity reported by Platts. As mentioned earlier, Platts collects data on bids, offers, and trades at the Argo Terminal that occur during the MOC Window each trading day. An example of the data collected and reported by Platts from the Argo Terminal is seen from the August 3, 2018 Biofuelscan report reproduced below.

US ethanol bids/offers/trades: (PBF page 209)
- MOC bids: Ethanol: Chicago Argo: Shell bids $1.4450/ gal, Aug 8- Aug 18, 5Kb; Eco bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Gunvor bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Valero bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Shell bids $1.4425/gal, Aug 8- Aug 18, 5Kb; BP bids $1.4425/ gal, Aug 8- Aug 18, 5Kb; Louis Dreyfus bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Shell bids $1.55/ gal, any-August, 25Kb; Hartree bids $1.54/gal, any-August, 25Kb.
- MOC offers: Ethanol: Chicago Argo: Vitol offers $1.4455/ gal, Aug 8- Aug 18, 5Kb; ADM offers $1.4475/gal, Aug 8- Aug 18, 5Kb; Center offers $1.45/gal, Aug 8- Aug 18, 5Kb; CHS offers $1.45/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Hartree offers $1.5650/gal, any-August, 25Kb; BP offers $1.5650/gal, any-August, 25Kb.
- MOC trades reported: Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Gunvor, $1.4450/gal, Aug 8- Aug 18, 5Kb. Other trades reported: None.

62.     This excerpted report shows ADM "hitting the bid" as the seller in all 5 trades that occurred during that day's MOC Window at $1.4450 per gallon – dropping below its own outstanding offer of $1.4475 per gallon and the best outstanding offer by Vitol at $1.4455 per gallon. Rather than incentivizing Shell and Gunvor to "lift the offer" and come up to Vitol's (or even ADM's) higher offer prices, ADM decided to leapfrog Vitol in order to "hit the bids" of the two potential buyers at $1.4450, even though they were likely willing to pay more. This can be analogized to a negotiation where two parties make opening demands/offers in anticipation of meeting somewhere in the middle, but one party then simply decides to accept the other party's lowball opening offer that both parties should understand to be simply a starting position rather than a reflection of true willingness to pay. ADM's conduct was not typical MOC Window negotiation behavior.

63.     This data also shows the impact that ADM's "hitting of the bid" had on the Platts Chicago Benchmark Price for this day. On August 3, 2018, that price was $1.44525 per gallon, a value reflective of the 5 trades at $1.4450 per gallon and the 2.5 points above the outstanding bid

($1.4450 per gallon by multiple buyers) and 2.5 points below the outstanding offer ($1.4455 per gallon by Vitol) during the MOC Window. This price would have been higher had buyers in the MOC Window been forced to "lift the offer" to the $1.4455 per gallon price quoted by Vitol, rather than by ADM hitting the lower $1.4450 per gallon bid on the 5 consummated trades.

64.     Starting in mid-November 2017 and continuing thereafter, ADM repeatedly engaged in this practice of aggressively hitting the lower-priced bids of ethanol buyers at the Argo Terminal Market during the MOC Window. ADM has also consistently made aggressively priced offers so as to either be the lowest seller offer during the MOC Window, or force a competitor to make an even more aggressive offer in order to offload their ethanol inventory at the Argo Terminal. Both types of practices were intended to artificially depress the Chicago Benchmark Price calculated during the MOC Window and have, in fact, resulted in artificially depressed Chicago Price Indexes, including the Chicago Benchmark Price, on all, or virtually all, trading days during the Relevant Time Period.

**F.     ADM's Conduct Was Intended to Control and Manipulate Prices.**

65.     Ample evidence indicates that during the Relevant Time Period, ADM has, in fact, artificially depressed ethanol prices and the Chicago Price Indexes; which, in turn, artificially depressed the price of ethanol nationwide and manipulated the value of Chicago Ethanol Derivatives.

66.     In 2016 and 2017, the falling price of ethanol in the United States was squeezing or eliminating the profit margins of ethanol producers, causing them to idle plants or consider exiting the business altogether.  Indeed, ADM attempted to sell three of its dry mill ethanol facilities (in Columbus, Nebraska; Cedar Rapids, Iowa; and Peoria, Illinois) beginning in 2016, but it did not obtain adequate bids to justify their sale. Nevertheless, until November 2017, ADM

had consistently been one of the largest buyers of ethanol at the Argo Terminal, including during the price-setting MOC Window.

67.     Starting shortly before November 17, 2017 and continuing thereafter, ADM began to amass huge short positions in Chicago Ethanol Derivatives. These huge positions represented a significant departure from ADM's previous hedging activities and bore no rational relationship to the amount of hedging that would have been necessary to cover ADM's exposure to physical ethanol sales. In various months during the Relevant Time Period, ADM acquired as many as 6,000-7,000 Chicago Ethanol (Platts) Futures contracts within the spot month – positions that were over twice as large as ADM's monthly production capacity, and represented 50% or more of the open interest in the relevant contract month.

68.     Also starting on or about November 17, 2017 and continuing thereafter, ADM suddenly shifted from being one of the largest buyers of ethanol at the Argo Terminal, including during the MOC Window, to being one of the largest sellers – even as ethanol prices continued to decline. By 2018, ADM accounted for roughly 70% of all ethanol sold in the Argo Terminal Market, and roughly 90% of sales during the price-setting MOC Window. In the month of November 2018, ADM sold 95% of the ethanol lots that traded during the price-setting MOC Window.

69.     The shift toward ADM becoming the largest seller of ethanol at the Argo Terminal and during the MOC Window occurred even as some of ADM's Producer-competitors cut production runs, shut down or idled plants, or sold ethanol plants due to slumping ethanol prices and margins.

70.     In October 2017, when ADM was the buyer in 32% of the Argo Terminal Market transactions during the MOC Window, the settlement price of the Chicago Ethanol (Platts) Futures

27

contract (which averages the Chicago Benchmark Prices across the entire month) was $1.425 per gallon – a level that was even then considered low and potentially not profitable for ethanol producers. But in 15 of the following 21 months – when ADM was the dominant seller during the MOC Window – the Chicago Ethanol (Platts) Futures contract settled at prices below the $1.425 per gallon level of October 2017.

71.     An economically rational actor "buys low and sells high." Yet ADM displayed the exact opposite approach – it was a buyer at the Argo Terminal when prices and margins were higher (pre-November 2017), and shifted toward becoming a massive seller (and remained one) right as prices and margins declined, including in December 2018 when the Chicago Benchmark Price hit 15-year lows. This is strong evidence both of ADM having actually engaged in manipulation and of its manipulation having achieved the desired price-depressing effect.

72.     ADM's aggressive selling of ethanol during the MOC Window is also economically irrational in the context of its own ethanol purchases at the Argo Terminal during the Relevant Time Period. In an effort to drive down the Chicago Benchmark Price, ADM frequently sold more ethanol during the MOC Window than it could physically deliver. As a result, ADM was forced to buy ethanol at the Argo Terminal to meet its contracted obligations. ADM routinely did so toward the end of the trading month, at prices that were higher than the prices it had sold ethanol for earlier in the month. This was another example of ADM selling low and buying high.

73.     Notably, from December 1, 2017 to at least March 29, 2019, ADM never bought a single lot of ethanol at the Argo Terminal in the Chicago Benchmark Price-setting MOC Window. But the MOC Window is likely where ADM would have found the most competitive price thanks to the public and ostensibly competitive bidding process that was supposed to take place in those

28

30 minutes.  Instead, ADM made all of its physical ethanol purchases outside of the MOC Window, thereby avoiding the possibility of having its own purchases increase the Chicago Benchmark Price and harm ADM's ethanol derivatives positions.

74.    As further evidence of ADM's manipulation, pricing data from the Relevant Time Period demonstrates that as a result of price variation between geographic regions, ADM could have received significantly higher prices and profits for its ethanol at other terminals or directly from other potential buyers, even after factoring in differences in transportation costs.  But instead of maximizing its own profits, ADM chose to continue oversupplying the Argo Terminal and offer its ethanol for below-market prices.

75.    Some examples of ADM's conduct during the relevant time period reinforces the inference that ADM was intentionally manipulating Argo Terminal prices by acting against its own best economic interests as an ethanol seller:

    a.  On November 28, 2018, ADM nominated eight barges of ethanol from New Orleans to Argo.  At the time, the New Orleans market was paying $1.35 for ethanol.  In contrast, buyers at Argo were willing to pay about $1.17 at that time. Although the economically rational course of conduct would have been to barge gallons of ethanol south to New Orleans for a substantial premium price over that available at Argo, ADM instead moved gallons away from a premium at New Orleans to sell them at a discount at Argo;.

    b.  Argo received an inbound train from ADM in the week following June 6, 2019. At that time, Rule 11 was trading at a $.03 premium to Argo,[3] and with throughput, ADM was sending gallons into Argo at a $.05 detriment;

---

[3] "Rule 11" refers to a unique spot market for ethanol at a railway switch near Chicago where buyers take railcars from sellers and return them after emptying.  The Rule 11 price is determined by an analysis of

c.  On June 19, 2019, ADM was sending barges back into Argo at a $0.04
    detriment to Rule 11; and

d.  Beginning around November 2017, heavy inbound rail was moving through the
    Argo Terminal and persisted through 2018, despite market conditions. ADM
    was also substantially responsible for this increased volume of supplies moved
    by rail into Argo.  ADM's increased use of the Argo Terminal's rail facilities
    to handle its inbound ethanol shipments added to the excess ethanol supply at
    Argo and also reduced the ability of the Argo Terminal to deliver ethanol to
    buyers, artificially depressing demand.

76.    ADM undertook these actions to reduce other Producer-competitors' participation
in the market and to drive those Producer-competitors out of the market, with the intent to gain
further market share in the Argo Terminal Market further cementing its control over the pricing
both at the Argo Terminal and nationwide.

77.    ADM's anomalous pricing and trading behavior at the Argo Terminal after
November 17, 2017 led various market participants to complain to Platts about the potential
manipulation of the Chicago Benchmark Price. In response to those complaints, Platts paid for and
hosted a July 2018 meeting at its offices located at 111 Bagby Street in Houston, Texas, and invited
major ethanol producers, brokers, and other stakeholders. Among the approximately 40
participants in the July 2018 meeting were Adam Kuffel of ADM; Sophie Byron and Ian Dudden
of Platts; and representatives from Shell, Trafigura, Vitol, CCI, Biourja, Eco-Energy, Green Plains,

---

local plant values and destination basis, plus freight from the plant to the Chicago Rule 11 interchange.  In
a normal market, to account for the throughput, Rule 11 trades flat to a slight discount to ethanol traded out
of the Argo terminal.

POET, Mercuria, and Marquis Energy. The CME also sent a senior official – Vish Subramanian, CME Group's Director of Energy Products – to attend the July 2018 meeting.

78.     At the meeting, Platts solicited comments from attendees regarding: its methodology for calculating the Chicago Benchmark Price during the MOC Window; whether any changes should be implemented to the methodology; and if so, why such changes should be made. In response, some participants pointed to ADM's aggressive selling and hitting the bid during the MOC Window as evidence that the benchmark price could be unduly influenced by an aggressive seller.

79.     ADM's representative Adam Kuffel did not directly address the implication that ADM might be having an outsized impact on the Chicago Benchmark Price.  Kuffel instead voiced ADM's opposition to an effort by some participants to decrease the ITT deliverable time for ethanol for the MOC Window from the current 5 to 15 days forward to just 2 to 10 days forward. Notably, a reduction in the ITT deliverable time would constrain ADM's ability to manipulate the MOC Window through aggressive selling of ethanol beyond what ADM could physically deliver. Specifically, ADM would have fewer days to find and buy ethanol outside the MOC Window to satisfy all of its delivery obligations.

80.     The intent of Mr. Kuffel's statements was to deter any action by Platts.  At the end of the meeting, Platts promised to take recommendations from all participants into account, but also indicated that it would not be able to change anything before, at the earliest, the beginning of 2019.

81.     Realizing that the Platts methodology was not being changed, Platts' competitor Argus Media saw an opportunity to lobby ethanol stakeholders and the CME to create an alternative to Platts' susceptible-to-manipulation Chicago Benchmark Price (tied to the MOC

31

Window), based on either an average price throughout the whole day of transactions at the Argo Terminal, or using the so-called "Rule 11" price calculations. Argus invited the CME and several ethanol market participants to a meeting in November 2018 at a hotel in Houston to discuss whether there was demand for a new ethanol derivative product that could generate sufficient liquidity and could not be manipulated by ADM. Argus specifically did not invite ADM to this meeting. Participants at this meeting included representatives from Trafigura, Eco-Energy, Green Plains, POET, CCI, Mercuria, and Biourja. The CME again sent Vish Subramanian to attend on its behalf. Despite not being invited, Adam Kuffel of ADM nonetheless attended the November 2018 meeting.

82.     At this meeting, Kuffel expressed his opinion that the Argo Terminal Market was functioning effectively and that ADM saw no reason to change the status quo. The purpose of Mr. Kuffel's statements was to deter any action. Jordan Fife of Biourja asked Kuffel why, if ADM thought the ethanol market was healthy, it brought in railcars to the Argo Terminal against "arbs" (*i.e.* at lower prices than they could have received via arbitrage at other terminals or from other buyers) in April/May 2018. Kuffel responded that he was "not at liberty to discuss ADM's strategies in this venue" – a response that did not offer any explanation for ADM's otherwise irrational sale practices at the Argo Terminal.

## G.     ADM's Senior Executives Knew About the Unlawful Scheme.

83.     ADM's scheme to artificially depress ethanol prices and then make up those losses with profit from its outsized investment in Chicago Ethanol Derivatives was not the product of rogue employees in ADM's ethanol division. The scheme was implemented with the knowledge of senior ADM officials, who were aware that the ethanol division was earning outsized profits

32

from large short positions in Chicago Ethanol Derivatives as a result of ADM's aggressive selling activity during the MOC Window at the Argo Terminal.

84.    The ethanol division at ADM routinely generated reports on its operations and its profits/losses for senior ADM officials, who in turn aggregated the reports into company financial reports for disclosure to ADM's investors. Through these reports, senior ADM officials were kept updated on the ethanol division's performance and were aware that the division was generating outsized trading profits despite historically low ethanol margins.

85.    Indeed, senior ADM officials publicly acknowledged the success of the scheme, though they couched it in euphemism. In an ADM earnings call on November 6, 2018 reporting on the third quarter of 2018 – a time of extremely low ethanol margins during which ADM was aggressively manipulating the Chicago Benchmark Price downward – ADM Executive Vice President and Chief Financial Officer Ray Guy Young reported (discussing the slide below) that ADM's bioproducts team (which included the ethanol group) "did a good job managing risk in [an] extremely weak ethanol industry margin environment." ADM's 10-Q from the third quarter of 2018 reported bioproducts had earned a $43 million operating profit, even as ADM's ethanol producer competitors were suffering losses as a result of this "extremely weak ethanol industry margin environment."



86.     ADM's 10-K filings likewise implicitly acknowledged the success of the manipulation scheme. For instance, in its 2018 filing, ADM stated that for 2018 compared to 2017, "[b]ioproducts results were down as near record industry fuel ethanol inventories pressured margins and production issues in the Decatur, IL corn complex increased costs, partially offset by effective ethanol risk management."   In the same filing, discussing 2017 performance compared to 2016, ADM noted that "[b]ioproducts profit increased due to higher trading results partially offset by slightly lower ethanol margins."

87.     On information and belief, the "effective ethanol risk management" and "higher trading results" in 2017 and 2018 referred to in ADM's 2018 10-K refer to the manipulative scheme discussed in this complaint, and reflect the fact that senior ADM officials such as those involved in preparing ADM's annual report were made aware of the manipulative scheme and its impact on the bioproducts division's profit.

**H.      The Impact of ADM's Scheme on Ethanol Prices.**

88.      ADM intended, or knew with substantial certainty, that its unlawful, manipulative actions to artificially depress the Chicago Price Indexes harmed other participants in the U.S. Ethanol Market.

89.      Buyers and sellers in the U.S. Ethanol Market rely on the Chicago Price Indexes to be "fair" and undistorted by manipulation. ADM manipulated these indexes and thereby lowered the prices at which Plaintiffs and other Producers sold ethanol under Producer Sales Contracts that were negotiated with a justifiable expectation that the Chicago Benchmark Price and the Chicago OPIS Price would not be manipulated.

90.      However, ADM understood that lowering prices in the Argo Terminal Market would have the effect of artificially depressing prices for ethanol sold throughout the United States and that it would cause the sales of ethanol by Plaintiffs and other Producers that were tied to the Chicago Price Indexes to occur at lower prices than they would have in the absence of its manipulation.

91.      ADM's manipulation of the Chicago Price Indexes distorted the market signals that suppliers, customers, and all other participants and stakeholders rely upon to make rational decisions about ethanol values. Prices incentivize behavior, and ADM's uneconomic behavior resulted in uneconomic outcomes to the detriment of Plaintiffs and other parties who rely on accurate and competitive ethanol pricing when making business and policy decisions.    For example, because of the link between the agriculture and the energy sectors of the economy, regulators and policymakers also monitor the Chicago Price Indexes and react to ethanol prices. Misleading and deceptive ethanol prices (as measured by the artificially low Chicago Price Indexes) can lead to wrong policies.

92.     The foreseeable harmful effect of ADM's price manipulation in the Argo Terminal Market and, more particularly, during the MOC Window, extended well beyond the Argo Terminal.  As noted above, it is well known in the industry that prices established through activity during the MOC Window at the Argo Terminal are used as the benchmark for pricing in Producer Sales Contracts nationwide, pricing over 70% of all ethanol sales in the United States.  The Chicago Pricing Indexes are also used for pricing of ethanol internationally.

93.     Therefore, ADM knew and intended that its manipulation of ethanol prices at the Argo Terminal, including during the MOC Window, would drive down the price that Plaintiffs received for ethanol under its Producer Sales Contracts, thereby denying Plaintiffs a level playing field and causing them financial damages.

## FRAUDULENT CONCEALMENT

94.     ADM did not disclose its unlawful scheme to the public or to other participants in the ethanol market.  In fact, ADM's scheme could only be effective if it kept the scheme secret because its continued success was reliant, in part, upon other market participants not knowing that the Chicago Price Indexes did not reflect competitive market prices of ethanol.  Plaintiffs could not reasonably have anticipated that the depressed ethanol prices they were receiving, either pursuant to Producer Sales Contracts or otherwise, were the result of a comprehensive scheme wherein ADM's was intentionally acting against its own apparent self-interest so that it could profit in the separate market for Chicago Ethanol Derivatives.  In fact, it took the insights of a derivative trader with access to extensive market data covering both the ethanol and the ethanol financial products markets, and with the ability to do detailed financial modeling, to uncover the purpose and extent of ADM's misconduct.

95.     Nor was it obvious that depressed ethanol prices during the Relevant Time Period were actually the result of ADM's illegal conduct.  During 2016 and early 2017, ethanol prices had been falling due to natural market forces.  Plaintiffs had no basis to suspect that ADM would then engage in illegal conduct designed to extend and supercharge the drop of ethanol prices in order to manipulate profits it could make from related financial products.   Even when confronted about its odd behavior regarding oversupplying the Argo Terminal Market with cheap ethanol, ADM concealed its role in causing the depressed pricing and represented that it believed the markets were functioning correctly.

## RELEVANT MARKETS

**A.     ADM Exercised Monopoly Power in the Argo Terminal Market, Thereby Controlling and Depressing Prices in the U.S. Ethanol Market.**

96.     ADM was able to actively control and manipulate the price of ethanol in the market for ethanol sold throughout the United States (the "U.S. Ethanol Market") where pricing was based upon the Chicago Price Indexes.  ADM had monopoly power in the U.S. Ethanol Market as evidenced by its ability to control the prices therein.

97.     ADM was able to control the price of ethanol in the U.S. Ethanol Market because those prices were dictated by the prices set in the market for the purchase and sale of ethanol at the Argo Terminal (the "Argo Terminal Market") including ethanol sales at the Argo Terminal Market during the MOC Window.

98.     Tens of thousands of barrels of ethanol change hands in the Argo Terminal Market on a daily basis, and ethanol prices set in the Argo Terminal Market and during the MOC Window are used as the benchmark for the market price of ethanol utilized industrywide in the U.S. Ethanol Market.  The role of the Argo Terminal Market as the price setting market for ethanol makes it unique.  In fact, prices established through activity during the MOC Window at the Argo Terminal

37

are used as the benchmark for pricing that prices over 70% of all ethanol sales in the United States. Accordingly, by acquiring monopoly power over ethanol sales at the Argo Terminal Market, including during the MOC Window, ADM was able to control and depress ethanol prices for the entire U.S. Ethanol Market.

99.     There are structural limitations specific to the Argo Terminal that enabled ADM to acquire monopoly power over the Argo Terminal Market and depress Argo Prices including, but not limited to:

    a.  <u>Argo Terminal Transportation Infrastructure</u>:  The Argo Terminal provides several means whereby suppliers can deliver ethanol for storage on-site and then delivery to ethanol purchasers.  Ethanol can be "loaded" and "unloaded" by vessel, by barge (the terminal is on the Chicago Sanitary & Ship Canal and has 3 barge docks), by railroad tank car (the terminal is serviced by the Canadian National Railroad) and by tank truck.  Accordingly, the ability of the Argo Terminal to receive ethanol from suppliers and then deliver ethanol to purchasers is limited by the terminal's infrastructure and there is an inverse relationship between the two.  In other words, an overscheduling of ethanol deliveries from suppliers will decrease the ability of the terminal to deliver ethanol to potential purchasers.

    b.  <u>Storage at the Argo Terminal</u>: The terminal has significant but limited on-site storage facilities.  Accordingly, an oversupply of ethanol from one seller can monopolize the terminal's storage capacity, preventing other sellers from delivering ethanol for storage and subsequent sale.

100.    Because ADM was selling below cost, there was no incentive for new sellers to try to enter the Argo Terminal Market to compete with ADM.  Simultaneously, because of the physical restrictions on the amount of ethanol that could be physically sold and/or delivered at the Argo Terminal, additional buyers were unable to enter the market to take advantage of ADM's low prices.  Had additional buyers been able to enter the Argo Terminal Market, demand would have increased and the artificial excess supply would have decreased.  As a result, in a competitive world, prices would have increased to market levels.

101.    ADM's conduct took advantage of these limitations.  Because ADM had significant operations adjacent to the Argo Terminal, ADM was able to flood the terminal with supplies of ethanol (creating a supply glut) that it then offered for sale at artificially low prices.  As a result of ADM's oversupply of ethanol, the terminal was forced to store ethanol on-site and create the artificial appearance of an excess supply, further driving down prices.  ADM also took steps during the Relevant Time Period to limit the amount of ethanol that could be physically sold at the Argo Terminal, thereby artificially restricting demand.  For example, in or about November 2018, ADM nominated multiple barges to the Argo Terminal at or near the same time which had the effect of preventing delivery of ethanol to potential buyers and overwhelming the terminal's limited take-away capacities.

102.    ADM was specifically seeking to acquire and/or maintain monopoly power in the Argo Terminal Market and the U.S. Ethanol Market by making it economically and physically difficult for competitors to sell at the Argo Terminal.  By driving competitors out of the Argo Terminal Market and/or preventing new entrants, ADM ensured that it would be able to continue and maintain its control over Argo Prices, the Chicago Price Indexes, and prices in the U.S. Ethanol Market.

**B.    ADM Possessed Monopoly Power in the Argo Terminal Market and the U.S. Ethanol Market.**

103.    ADM's dominant ethanol operations located near the Argo Terminal combined with the structural limitations of the Argo Terminal described above made it possible for ADM to monopolize ethanol sold at the Argo Terminal Market and unilaterally manipulate Argo Prices so that the prices did not reflect what the prevailing prices would have been if the Argo Terminal Market was behaving competitively.

104.    ADM's monopoly power in the Argo Terminal Market is evidenced directly by the fact that, as described above, it actually manipulated and depressed the prices at which ethanol was sold at the Argo Terminal, including specifically during the MOC Window.

105.    ADM's monopoly power in the Argo Terminal Market is also evidenced by its market share.  Beginning during the relevant time period and through 2019, ADM controlled 70% of the Argo Terminal Market and ADM accounted for 90% of ethanol sold during the critical MOC Window.

106.    ADM's monopoly power in the U.S. Ethanol Market is evidenced by the fact that, as described above, it controlled U.S. Ethanol Market prices.  More particularly, ADM actually manipulated and depressed the prices at which ethanol was sold in the U.S. Ethanol Market through its conduct in the Argo Terminal Market which has a unique role in setting ethanol prices nationwide.

107.    ADM's attempt to acquire and maintain monopoly power over the price of ethanol sold in the Argo Terminal Market and over prices of ethanol sold in the U.S. Ethanol Market was not the result of superior business acumen or product, it was a part of a its willful plan to subvert the U.S. Ethanol Market.  Were ADM's conduct not intended to obtain or sustain monopoly power, it would be uneconomic and irrational. Accordingly, the only reasonable inference that can be

40

drawn from ADM's conduct is that it intended to control prices and exclude competition, and the facts show that ADM succeeded at both.  It effectively excluded competitors from the Argo Terminal Market, and it artificially depressed the price for ethanol sold in the Argo Terminal Market, particularly during the MOC Window, and the U.S. Ethanol Market.  ADM was able to leverage its control over the Argo Terminal Market and effectively exercise monopoly power over U.S. Ethanol Market prices.

## C.    ADM's Monopoly Power Was Durable.

108.    ADM's control over the Argo Terminal Market, and therefore, the U.S. Ethanol Market, also proved to be durable.  Despite suspicions that eventually arose that ADM was intentionally manipulating Argo Prices and the related Chicago Price Indexes, there was little that could be done to rein in ADM.  Platts acknowledged that it could try to minimize the incentives that ADM may have to manipulate ethanol pricing during the MOC Window by basing its Chicago Benchmark Price index on sales made throughout the entire trading day; however, Platts stated that even this simple change would take at least 6 months to effectuate.

109.    Moreover, even eliminating the MOC Window and basing the Chicago Benchmark Price on all ethanol traded in the Argo Terminal Market during the entire trading day would not have prevented ADM's manipulation because its monopoly power covered all sales in the Argo Terminal Market.  More particularly, as noted above, while ADM controlled 90% of sales made during the MOC Window, ADM controlled 70% of sales made at the Argo Terminal Market daily and as a result, it was also able to manipulate the Chicago OPIS Price.  Accordingly, simply changing the methodology for determining the Chicago Benchmark Price would not prevent or meaningfully disincentivize ADM's conduct.

41

110.    Adding infrastructure at the Argo Terminal, to enable it to handle more ethanol, thereby reducing the artificial supply glut ADM created in order to drive down ethanol prices, was equally difficult in the short term.  On February 20, 2019, it was reported that Kinder Morgan, the operator of the Argo Terminal, was seeking to make such infrastructure changes.  Kinder Morgan sought to double the number of ethanol barges that could load and unload at its existing Argo docks and build a new 50,000-barrel storage tank at its Stony Island facility near the Argo Terminal, which loads and unloads ethanol trains.  However, these changes also would take time, and at that time, Kinder Morgan stated that the improvements to the docks could not be done until the end of 2019 at best.

111.    Accordingly, ADM was aware that its power to manipulate Argo Prices and, in turn, the Chicago Price Indexes, was durable because neither Platts, OPIS or Kinder Morgan could do anything in the short run that would have prevented the impact of ADM's misconduct.

112.    The durability of ADM's artificially depressed pricing was also not limited by it having to absorb losses while it sought to acquire monopoly power because ADM was able to offset its losses from the outset by investing in Chicago Ethanol Derivatives tied to the manipulated Chicago Price Indexes.  In other words, while ADM's misconduct forced its competitors to reduce supply and will likely lead to some competitors leaving the ethanol market, ADM did not need to suffer harm in the short term because it had the wherewithal to continue to underprice its competitors and force them to leave the ethanol market while it pocketed illegal profits from its derivatives trades.

113.    In addition, once an ethanol producer leaves the ethanol market, it is difficult to re-enter the ethanol market.  Most importantly, there are significant costs involved in restarting an ethanol plant.  In addition, once a producer leaves the market, customers find new suppliers such

42

that if a Producer did decide to reenter the market, they would need to "buy back" their old customers or find new customers. Accordingly, in addition to immediately financially injuring Plaintiffs, ADM's predatory conduct also presented a dangerous probably of resulting in supra-competitive prices and lower output for the U.S. Ethanol Market at large.

## VIOLATIONS ALLEGED

### COUNT I

**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Monopolization**
**On Behalf of All Plaintiffs**

114. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

115. ADM, the single largest producer of ethanol in the United States, unlawfully monopolized trade or commerce in the U.S. Ethanol Market and the Argo Terminal Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116. During the Relevant Time Period, ADM possessed monopoly power in the U.S. Ethanol Market and was able to control prices of ethanol therein.

117. During the Relevant Time Period, ADM possessed monopoly power in the Argo Terminal Market and was able to control prices and exclude competition therein.

118. During the Relevant Time Period, ADM's market share in the Argo Terminal Market was seventy percent (70%) and its market share during the important MOC Window was ninety percent (90%).

119. As set forth at length herein, ADM repeatedly exercised its monopoly power in the Argo Terminal Market through anticompetitive, exclusionary and predatory acts which artificially depressed prices for ethanol in the Argo Terminal Market.

43

120.    ADM intentionally sought to artificially depress Argo Prices so that it could depress the Chicago Price Indexes which, in turn, would increase the value of ADM's Short Position Chicago Ethanol Derivatives.  Accordingly, the losses sustained by ADM as a result of selling ethanol at artificially depressed prices were more than offset by the additional, supra-competitive profits it earned on its Short Position Chicago Ethanol Derivatives.

121.    By intentionally depressing the Chicago Price Indexes, ADM intended or knew with substantial certainty that its anticompetitive scheme would result in artificially depressed ethanol prices in the U.S. Ethanol Market because the pricing of most ethanol sold throughout the United States is based upon the Chicago Price Indexes. Accordingly, by driving down ethanol prices, ADM intended to drive competitors like Plaintiffs out of the ethanol market, further entrenching its control over the pricing of ethanol nationwide.

122.    By exercising control over Argo Prices, ADM was able to exert monopoly power over pricing in the U.S. Ethanol Market.  For example, by controlling the daily price for 1 million gallons of ethanol it sold at the Argo Terminal Market in the MOC Window, ADM was able to manipulate the price for 32 million gallons of ethanol sold in the U.S. Ethanol Market.

123.    As discussed above, ADM's predatory conduct in the Argo Terminal Market was irrational and against its own economic interest.  ADM's conduct was not dictated by normal business practices but instead by unlawful intent to maintain and/or utilize its monopoly power for anticompetitive means.

124.    The anticompetitive acts done by ADM as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of ADM's affairs.

125.    ADM's misconduct and its resulting impact occurred in or affected interstate commerce.

126.    Plaintiffs sold ethanol at prices that incorporated Chicago Price Indexes, primarily in accordance with their Producer Sales Contracts, and were therefore, artificially depressed as a result of ADM's unlawful conduct.

127.    Therefore, as a direct and proximate result of the ADM's unlawful conduct, Plaintiffs have suffered injury in their business and property.

## COUNT II

### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)
### Attempted Monopolization
### On Behalf of All Plaintiffs

128.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

129.    In violation of Section 2 of the Sherman Act, ADM intentionally engaged in anticompetitive conduct with the specific intent to acquire and maintain monopoly power in the Argo Terminal Market and the U.S. Ethanol Market.

130.    As set forth at length herein, ADM repeatedly sought to obtain and exercise market power in the Argo Terminal Market and the U.S. Ethanol Market through anticompetitive, exclusionary and predatory means.  ADM intended or knew with substantial certainty that its anticompetitive scheme would result in depressed prices for ethanol sold throughout the entire U.S. Ethanol Market.

131.    ADM's anticompetitive conduct alleged herein, such as flooding the Argo Terminal Market with excess supply, below-market pricing and restricting access to the supply channels at the Argo Terminal Market, along with structural limitations at the Argo Terminal gave ADM a

dangerous probability of achieving monopoly power over ethanol sales in the Argo Terminal Market and pricing in the U.S. Ethanol Market.

132.    In fact, ADM had already achieved significant market power, as evidence by its actual control of prices in the Argo Terminal Market and U.S. Ethanol Market.  Indeed, its market share in the Argo Terminal Market was seventy percent (70%) and its market share during the important MOC Window was ninety percent (90%).

133.    ADM's scheme to artificially depress Argo Prices and the related Chicago Price Indexes had the effect of restricting competition, reducing supply and distorting the Argo Terminal Market and the U.S. Ethanol Market.  ADM was insulated from the economic consequences of driving down ethanol prices because, as a result of the artificially depressed Chicago Benchmark Price, the value of ADM's Short Position Chicago Ethanol Derivatives was artificially increased. ADM's supra-competitive gains on its derivative investments more than made up for any losses incurred on its sales of ethanol.

134.    ADM's conduct was not dictated by normal business practices but instead by unlawful intent to obtain, maintain and/or utilize its monopoly power for anticompetitive means.

135.    By intentionally depressing the Chicago Price Indexes, ADM intended or knew with substantial certainty that its anticompetitive scheme would result in artificially depressed ethanol prices in the U.S. Ethanol Market because the pricing of most ethanol sold throughout the United States is based upon the Chicago Price Indexes.  Accordingly, by driving down ethanol prices, ADM intended to drive competitors like Plaintiffs out of the ethanol market, further entrenching its control over the pricing of ethanol nationwide.

46

136.     The anticompetitive acts done by ADM as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of ADM's affairs.

137.     ADM's misconduct and its resulting impact occurred in or affected interstate commerce.

138.     Plaintiffs sold ethanol at prices that incorporated Chicago Price Indexes, primarily in accordance with their Producer Sales Contracts, and were therefore, artificially depressed as a result of ADM's unlawful conduct.

139.     Therefore, as a direct and proximate result of the ADM's unlawful conduct, Plaintiffs have suffered injury in their business and property.

## COUNT III

**Violation of Illinois Antitrust Act (IL St CH 730 § 10/3(3))**
**Monopolization**
**On Behalf of All Plaintiffs**

140.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

141.     Illinois antitrust law also makes monopolization illegal.  More particularly, Illinois antitrust law makes it illegal for any person to "[e]stablish, maintain, use or attempt to acquire monopoly power over any substantial part of trade or commerce of this state for the purpose of excluding competition or of controlling, fixing or maintaining prices in such trade or commerce." *See* IL St CH 740 § 10/3.

142.     ADM, the single largest producer of ethanol in the United States, unlawfully monopolized trade or commerce in the U.S. Ethanol Market and the Argo Terminal Market in violation of Illinois law.

47

143.    During the Relevant Time Period, ADM possessed monopoly power in the U.S. Ethanol Market and was able to control prices of ethanol therein.

144.    During the Relevant Time Period, ADM possessed monopoly power in the Argo Terminal Market and was able to control prices and exclude competition therein.

145.    During the Relevant Time Period, ADM's market share in the Argo Terminal Market was seventy percent (70%) and its market share during the important MOC Window was ninety percent (90%).

146.    As set forth at length herein, ADM repeatedly exercised its monopoly power in the Argo Terminal Market through anticompetitive, exclusionary and predatory acts which artificially depressed prices for ethanol in the Argo Terminal Market.

147.    ADM intentionally sought to artificially depress Argo Prices so that it could depress the Chicago Price Indexes which, in turn, would increase the value of ADM's Short Position Chicago Ethanol Derivatives.  Accordingly, the losses sustained by ADM as a result of selling ethanol at artificially depressed prices were more than offset by the additional, supra-competitive profits it earned on its Short Position Chicago Ethanol Derivatives.

148.    By intentionally depressing the Chicago Price Indexes, ADM intended or knew with substantial certainty that its anticompetitive scheme would result in artificially depressed ethanol prices in the U.S. Ethanol Market because the pricing of most ethanol sold throughout the United States is based upon the Chicago Price Indexes.  Accordingly, by driving down ethanol prices, ADM intended to drive competitors like Plaintiffs out of the ethanol market, further entrenching its control over the pricing of ethanol nationwide.

149.    By exercising control over Argo Prices, ADM was able to exert monopoly power over pricing in the U.S. Ethanol Market.  For example, by controlling the daily price for 1 million

gallons of ethanol it sold at the Argo Terminal Market in the MOC Window, ADM was able to manipulate the price for 32 million gallons of ethanol sold in the U.S. Ethanol Market.

150. As discussed above, ADM's predatory conduct in the Argo Terminal Market was irrational and against its own economic interest. ADM's conduct was not dictated by normal business practices but instead by unlawful intent to maintain and/or utilize its monopoly power for anticompetitive means.

151. The anticompetitive acts done by ADM as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of ADM's affairs.

152. Plaintiffs sold ethanol at prices that incorporated Chicago Price Indexes, primarily in accordance with their Producer Sales Contracts, and were therefore, artificially depressed as a result of ADM's unlawful conduct.

153. Therefore, as a direct and proximate result of the ADM's unlawful conduct, Plaintiffs have suffered injury in their business and property.

## COUNT IV

**Violation of Illinois Antitrust Act (IL St CH 730 § 10/3(3))**
**Attempted Monopolization**
**On Behalf of All Plaintiffs**

154. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

155. In violation of Illinois law, *see* IL St CH 740 § 10/3, ADM intentionally engaged in anticompetitive conduct with the specific intent to acquire and maintain monopoly power in the Argo Terminal Market and the U.S. Ethanol Market.

156.    As set forth at length herein, ADM repeatedly sought to obtain and exercise market power in the Argo Terminal Market and the U.S. Ethanol Market through anticompetitive, exclusionary and predatory means.  ADM intended or knew with substantial certainty that its anticompetitive scheme would result in depressed prices for ethanol sold throughout the entire U.S. Ethanol Market.

157.    ADM's anticompetitive conduct alleged herein, such as flooding the Argo Terminal Market with excess supply, below-market pricing and restricting access to the supply channels at the Argo Terminal Market, along with structural limitations at the Argo Terminal gave ADM a dangerous probability of achieving monopoly power over ethanol sales in the Argo Terminal Market and pricing in the U.S. Ethanol Market.

158.    In fact, ADM had already achieved significant market power, as evidence by its actual control of prices in Argo Terminal Market and U.S. Ethanol Market.  Indeed, its market share in the Argo Terminal Market was seventy percent (70%) and its market share during the important MOC Window was ninety percent (90%).

159.    ADM's scheme to artificially depress Argo Prices and the related Chicago Price Indexes had the effect of restricting competition, reducing supply and distorting the U.S. Ethanol Market.  ADM was insulated from the economic consequences of driving down ethanol prices because, as a result of the artificially depressed Chicago Benchmark Price, the value of ADM's Short Position Chicago Ethanol Derivatives was artificially increased.  ADM's supra-competitive gains on its derivative investments more than made up for any losses incurred on its sales of ethanol.

160.    ADM's conduct was not dictated by normal business practices but instead by unlawful intent to obtain, maintain and/or utilize its monopoly power for anticompetitive means.

161.    By intentionally depressing the Chicago Price Indexes, ADM intended or knew with substantial certainty that its anticompetitive scheme would result in artificially depressed ethanol prices in the U.S. Ethanol Market because the pricing of most ethanol sold throughout the United States is based upon the Chicago Price Indexes.   Accordingly, by driving down ethanol prices, ADM intended to drive competitors like Plaintiffs out of the ethanol market, further entrenching its control over the pricing of ethanol nationwide.

162.    The anticompetitive acts done by ADM as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of ADM's affairs.

163.    Plaintiffs sold ethanol at prices that incorporated Chicago Price Indexes, primarily in accordance with their Producer Sales Contracts, and were therefore, artificially depressed as a result of ADM's unlawful conduct.

164.    Therefore, as a direct and proximate result of the ADM's unlawful conduct, Plaintiffs have suffered injury in their business and property.

## COUNT V

### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (815 ILCS § 505, *et seq*.)
### On Behalf of All Plaintiffs

165.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

166.    ADM's scheme to artificially depress prices in the Argo Terminal Market and the U.S. Ethanol Market, and to manipulate the Chicago Price Indexes so that it could make supra-competitive returns on its outsized portfolio of Short Position in Chicago Ethanol Derivatives, was a deceptive and/or unfair practice in violation of Illinois law.  *See* 815 ILCS § 505, *et seq*.

51

167.    ADM's conduct distorted the market signals that suppliers, customers, and all other market participants and stakeholders rely upon to make rational decisions regarding ethanol pricing.   ADM made offers to sell under the false impression that they were being made as competitive offers when they were, in fact, not competitive but instead intended to distort and depress the actual market prices so that ADM could benefit from its outsized purchases of Short Positions in Chicago Ethanol Derivatives.   ADM further tried to hide its scheme by attending meetings and specifically reassuring other market participants that no changes to the Argo Terminal Market or MOC Window needed to be made because the market was functioning properly.

168.    ADM intended that ethanol producers and sellers, including Plaintiffs, rely on its deceptive and/or unfair practices.   ADM's scheme to profit from its outsized purchases of Short Positions in Chicago Ethanol Derivatives would only be profitable if Plaintiffs and others relied on the manipulated Chicago Price Indexes because the only way that ADM could profit from its financial investments would be if the depressed Chicago Price Indexes were accepted as the actual "market price" of ethanol and if the Chicago Benchmark Prices continued to be used to measure the value of ethanol derivatives.

169.    ADM's deceptive and/or unfair conduct occurred in the course of trade or commerce consisting of the offering for sale, the sale and the distribution of ethanol.

170.    Plaintiffs suffered actual monetary damages as a result of ADM's deceptive and/or unfair practices.   ADM's deceptive and/or unfair practices proximately caused Plaintiffs' damages because absent ADM's misconduct, Plaintiffs would have received higher prices on their sales of ethanol during the Relevant Time Period.

## COUNT VI

**Violation of Wisconsin Deceptive Practices Act – Fraudulent Misrepresentations**
**(Wis. Stat. § 100.18)**
**On Behalf of the Wisconsin Plaintiffs**

171.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

172.     In the course of its scheme to artificially depress prices in the Argo Terminal Market and the U.S. Ethanol Market, and to  manipulate the Chicago Price Indexes so that it could make supra-competitive returns on its outsized portfolio of Short Position in Chicago Ethanol Derivatives, ADM knowingly made untrue, deceptive and misleading representations regarding the operation of the Argo Terminal Market as well as the related Chicago Price Indexes in violation of Wisconsin law.  *See* Wis. Stat. § 100.18.

173.     ADM made offers to sell under the false impression that they were being made as competitive offers when they were, in fact, not competitive but instead intended to distort and depress the actual market prices so that ADM could benefit from its outsized purchases of Short Positions in Chicago Ethanol Derivatives. These offers were untrue, deceptive and/or misleading. ADM made these offers to distort the market signals that suppliers, customers, and all other market participants and stakeholders rely upon to make rational decisions regarding ethanol pricing.

174.     ADM attended meetings and specifically made untrue, deceptive and/or misleading statements to reassure other market participants that no changes to the operation of the Argo Terminal Market needed to be made because the market was functioning properly thereby inducing others to refrain from making structural changes that would have made ADM's misconduct less profitable.

53

175.    ADM intended that ethanol producers and sellers, including the Wisconsin Plaintiffs, rely on the untrue, deceptive and/or misleading statements.  ADM's scheme to profit from its outsized purchases of Short Positions in Chicago Ethanol Derivatives would only be profitable if Plaintiffs and others relied on the manipulated Chicago Price Indexes because the only way that ADM could profit from its financial investments would be if the depressed Argo Prices were accepted as the actual "market price" of ethanol and if the Chicago Benchmark Prices continued to be used to price ethanol and ethanol derivatives.

176.    The Wisconsin Plaintiffs, like other ethanol producers, relied upon the untrue, deceptive and/or misleading statements to conclude that the U.S. Ethanol Market and the Argo Terminal Market were functioning correctly and that the Chicago Price Indexes that were derived from the activity in that Argo Terminal Market were indicative of the "market price" of ethanol. As a result of this reliance, the Wisconsin Plaintiffs suffered a pecuniary loss.

## COUNT VII

### Tortious Interference with Contractual Relations Under Iowa Law
### On Behalf of Plaintiff Pine Lake Corn

177.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

178.    Plaintiff Pine Lake Corn had contracts with third parties for the sale of physical ethanol in which the price received for that ethanol was set, in whole or in part, based on Chicago Price Indexes ("Pine Lake Sales Contracts").

179.    Because it is the standard practice in the ethanol industry, ADM had full knowledge and understanding that contracts for the sale of ethanol from ethanol producers, including the Pine Like Sales Contracts, typically included provisions whereby the price charged for the ethanol under the contract was set by reference to Chicago Price Indexes.

180.    ADM's scheme to depress the price of ethanol in the U.S. Ethanol Market and the Argo Terminal Market was intentional conduct by ADM and improperly interfered with the Pine Lake Sales Contracts. ADM's interference with the Pine Lake Sales Contracts was improper in that it, among other things, was undertaken with the unlawful, deceptive, manipulative and anticompetitive motivations described above.

181.    Pine Lake Corn suffered damage as a result of ADM's interference with the Pine Lake Sales Contracts.  ADM's interference with the Pine Lake Sales Contracts made performance more burdensome or expensive and Pine Lake Corn suffered financial loss as a result.

182.    Even though Plaintiff Pine Lake Corn performed its obligations under the Pine Lake Sales Contracts, it lost all or part of the profits that it would otherwise have obtained if ADM had not engaged in its unlawful scheme.

## <u>COUNT VIII</u>

### Tortious Interference with Contractual Relations Under Wisconsin Law
### On Behalf of the Wisconsin Plaintiffs

183.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

184.    The Wisconsin Plaintiffs had contracts with third parties for the sale of ethanol in which the price received for that ethanol was set, in whole or in part, based on Chicago Price Indexes ("Wisconsin Plaintiffs Sales Contracts").

185.    Because it is the standard practice in the ethanol industry, ADM knew had full knowledge and understanding that contracts for the sale of ethanol from ethanol producers, including the Wisconsin Plaintiffs Sales Contracts, typically included provisions whereby the price charged for the ethanol under the contract was set by reference to Chicago Price Indexes.

55

186.    ADM's scheme to depress the price of ethanol in the U.S. Ethanol Market, and the Argo Terminal Market was intentional conduct by ADM and improperly interfered with the Wisconsin Plaintiffs Sales Contracts. ADM knew, or should have known, that such interference was substantially certain to occur as a result of its conduct.

187.    ADM's interference with the Wisconsin Plaintiffs Sales Contracts was improper. Such interference was undertaken with the unlawful, deceptive, manipulative and anticompetitive motivations described above.  The interference was not justified and no privilege attached to ADM's misconduct.

188.    ADM's interference caused the Wisconsin Plaintiffs to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against ADM as follows:

a.    that ADM's unlawful conduct alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act (15 U.S.C.§ 2) prohibiting monopolization and attempted monopolization;

b.    that ADM's unlawful conduct alleged herein be adjudged and decreed in violation of Illinois antitrust law (740 ILCS § 10/3) prohibiting monopolization and attempted monopolization;

c.    that ADM's unlawful conduct alleged herein be adjudged and decreed in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS § 505);

d.      that ADM's unlawful conduct alleged herein be adjudged and decreed in violation
        of the Wisconsin Deceptive Practices Act regarding fraudulent misrepresentations
        (Wis. Stat. § 100.18);

e.      that ADM's unlawful conduct alleged herein be adjudged and decreed in violation
        of Iowa law prohibiting tortious interference with contractual relations;

f.      that ADM's unlawful conduct alleged herein be adjudged and decreed in violation
        of Wisconsin law prohibiting tortious interference with contractual relations;

g.      that ADM be ordered to pay actual damages and treble damages as well as any
        additional statutory damages, punitive damages, exemplary damages and/or
        restitution to Plaintiffs as allowable by law;

h.      that ADM be ordered to pay both pre- and post-judgment interest on any amounts
        awarded;

i.      that ADM be enjoined from continuing the misconduct alleged in this Complaint
        and issuing any other appropriate injunctive and other equitable relief against
        ADM;

j.      that the Court award Plaintiffs their costs of suit, including reasonable attorneys'
        fees and expenses; and

k.      that the Court award any and all such other relief as the Court may deem just and
        proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 11, 2020                                      Respectfully submitted,


    */s/ James P. Fieweger*
James P. Fieweger, #6206915
**MICHAEL BEST & FRIEDRICH LLP**
444 West Lake Street, Suite 3200
Chicago, IL 60606
Telephone: (312) 222-0800
Facsimile: (312) 222-0818
jpfieweger@michaelbest.com


Joseph L. Olson, # 1046162
Todd E. Palmer, # 1020197
**MICHAEL BEST & FRIEDRICH LLP**
790 N. Water Street, Suite 2500
Milwaukee, WI 53202
Telephone: (414) 271-6560
Facsimile: (414) 277-0656
jlolson@michaelbest.com
tepalmer@michaelbest.com


Austin B. Cohen (*pro hac vice* forthcoming)
Keith J. Verrier (*pro hac vice* forthcoming)
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
acohen@lfsblaw.com
kverrier@lfsblaw.com

*Counsel for Plaintiffs*

58