E-FILED
Tuesday, 28 September, 2021  12:20:41 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **UNITED WISCONSIN GRAIN PRODUCERS LLC, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 20-CV-2314** |
| | ) | |
| **ARCHER DANIELS MIDLAND COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## O R D E R

Plaintiffs United Wisconsin Grain Producers LLC, Didion Ethanol, LLC, Ace Ethanol, LLC, Fox River Valley Ethanol, LLC, Badger State Ethanol, LLC, and PLCP, LLLP, filed a Complaint (#1) against Defendant Archer Daniels Midland Company ("ADM"), alleging that Defendant violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Plaintiffs also bring several supplemental state law claims. Plaintiffs allege violations of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1 et seq., violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 et seq., violations of the Wisconsin Deceptive Trade Practices Act ("DTPA"), Wis. Stat. § 100.18, and claims for Wisconsin and Iowa common law tortious interference with contract. ADM filed a Motion to Dismiss (#12) on January 15, 2021. Plaintiffs filed

a Memorandum in Opposition (#17) on February 5, 2021. ADM filed a Reply (#22) on

March 4, 2021. Plaintiffs filed a Surreply (#25) on March 17, 2021.

ADM's Motion to Dismiss (#12) is GRANTED for the following reasons.

## I.  BACKGROUND

The following background facts are taken from the allegations in Plaintiffs'

Complaint (#1). At this stage of the proceedings, the court must accept as true all

material allegations in the Complaint, drawing all reasonable inferences therefrom in

Plaintiffs' favor. See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir.

2016).

The following is an overview of ADM's alleged wrongful conduct. Specific

allegations will be discussed in detail, where relevant, in the Analysis section.

Plaintiffs alleged unlawful conduct by ADM to depress ethanol prices. ADM's

conduct occurred at the Kinder Morgan terminal in Argo, Illinois ("Argo Terminal").

Trading for ethanol at the Argo Terminal during the half-hour "Market-on-Close"

("MOC") period each trading day determines the Chicago Benchmark Price created by

S&P Global Platts ("Platts"). Platts' Chicago Benchmark Price sets the value of Chicago

Ethanol Derivatives (i.e., ethanol futures contracts and options contracts traded on the

Chicago Mercantile Exchange). Trades at the Argo Terminal are also used by the Oil

Price Information Service ("OPIS") in its reports of daily Chicago OPIS Prices.

Plaintiffs and ADM are competitors in the production and sale of ethanol.

Plaintiffs are smaller producers than ADM. One or more Plaintiff is from each of the

following states: Illinois, Wisconsin, and Iowa. Federal law requires renewable fuels to

be blended into gasoline, and the main buyers of ethanol are refineries, blenders, gasoline resellers, and the like. Plaintiffs sell ethanol primarily pursuant to Producer Sales Contracts that specify prices in a formula based on the Chicago Benchmark Price, Chicago Ethanol Derivatives Prices, or Chicago OPIS Prices, all determined to some extent by sales prices at the Argo Terminal during the MOC window.

Prior to November 2017, ADM had been a consistent buyer of ethanol at the Argo Terminal during the MOC window. From November 17, 2017, until an unknown date in at least mid-2019, ADM became a prolific seller during the Argo Terminal's MOC window, "flooding" Argo with ethanol that it intentionally sold at uneconomically low prices in order to benefit its outsized short positions in ethanol derivatives.[1] ADM's conduct included uneconomically buying and shipping ethanol to Argo when the prices at the Argo Terminal were already lower than those at other terminals; selling ethanol at the Argo Terminal for less than ADM's variable cost to produce or obtain the ethanol; selling during the MOC window even when ADM did not have enough physical ethanol to deliver to satisfy the sales contracts; and aggressively reducing its prices during the MOC window to capture ninety to one hundred percent of sales during the MOC window. The Complaint further alleges that ADM controlled seventy percent of the overall Argo Terminal Market.

ADM's conduct resulted in decreased ethanol prices at the Argo Terminal and an accompanying decrease in Chicago Ethanol Derivative Prices determined by the daily

---

[1] A short position is a trading position where a derivative investment earns money for a trader if the price of the underlying commodity decreases.

MOC window prices at the Argo Terminal. These price decreases produced substantial gains for ADM on its short positions in Chicago Ethanol Derivatives, sufficient to compensate ADM for its sales losses incurred at Argo, with profit to spare.

Plaintiffs incurred losses when they sold ethanol pursuant to Producer Sales Contracts in which prices were based on a formula incorporating the depressed MOC window ethanol prices from the Argo Terminal.

## II. ANALYSIS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a Rule 12(b)(6) dismissal motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court draws all reasonable inferences in favor of the plaintiff but need not accept as true legal assertions, threadbare recitals of the elements of a cause of action, or conclusory statements. See *Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014).

A. <u>ADM's Motion to Dismiss</u>

1. *Plaintiffs' Antitrust Claims*

Plaintiffs allege monopolization (Count I) and attempted monopolization (Count II) in violation of the Sherman Antitrust Act, 15 U.S.C. § 2, and monopolization (Count III) and attempted monopolization (Count IV) under parallel provisions of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(3).

4

Legal standards under federal antitrust law and Illinois antitrust law are the same, so this order addresses Counts I-IV together in this section. See *Hannah's Boutique v. Surdej*, 112 F. Supp. 3d 758, 765 n.7 (N.D. Ill. 2015); *Int'l Equip. Trading v. AB SCIEX*, 2013 WL 4599903, at *3 n.1 (N.D. Ill. Aug. 29, 2013). "Illinois Antitrust Act claims will stand or fall with federal … claims based on the same underlying facts and legal theories." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 225328, at *16 (N.D. Ill. Jan. 15, 2015); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 989-90 (Ill. 1990).

Private civil actions to enforce the Sherman Antitrust Act are allowed under the Clayton Act, 15 U.S.C. § 15. *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 926 (7th Cir. 1995). To recover under the Clayton Act, the plaintiff must first prove "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

If an antitrust injury is adequately alleged the plaintiff must still allege the offenses of monopoly or attempted monopoly.

The antitrust offense of monopoly has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The second element is also sometimes referred to as "anticompetitive conduct." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

To demonstrate attempted monopoly, the plaintiff must prove (1) "a dangerous probability of achieving monopoly power," and (2) anticompetitive conduct intended to achieve monopoly power. *Spectrum Sports*, 506 U.S. at 456.

In its Motion to Dismiss (#12), ADM argues (1) Plaintiffs did not allege they suffered any antitrust injury, (2) Plaintiffs did not allege ADM engaged in anticompetitive conduct, (3) Plaintiffs did not allege ADM has achieved monopoly power or a dangerous probability of achieving monopoly power because (a) there are no anticompetitive effects, (b) ADM does not have a dominant share of a legally viable market, and (c) the Argo Terminal "market" is not protected by significant barriers to entry. ADM also argues that Plaintiffs' state law claims should be dismissed.

i. Antitrust Injury

ADM argues that Plaintiffs' allegations of dramatically lowered ethanol prices do not constitute antitrust injury because antitrust injury is a loss that results "from acts that reduce output or *raise* prices." *Chicago Pro. Sports v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (emphasis added). ADM maintains that an antitrust injury cannot be premised on lower prices, as alleged in the Complaint.

The Seventh Circuit has held that a "plaintiff who wants something, such as less competition or higher prices, that would injure consumers, does not suffer antitrust injury." *U.S. Gypsum Co. v. Indiana Gas, Inc.*, 350 F.3d 623, 627 (7th Cir. 2003). Likewise, the United States Supreme Court has held:

> Antitrust injury does not arise for purposes of § 4 of the Clayton Act …
> until a private party is adversely affected by an *anticompetitive* aspect of
> the defendant's conduct, see *Brunswick*, 429 U.S., at 487, 97 S.Ct., at 696; in

6

the context of pricing practices, only predatory pricing has the requisite
anticompetitive effect…. Low prices benefit consumers regardless of how
those prices are set, and so long as they are above predatory levels, they
do not threaten competition. Hence, they cannot give rise to antitrust
injury.

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-40 (1990) (emphasis in original).

Therefore, the injury alleged in the Complaint does not constitute an antitrust

injury sufficient to support Plaintiffs' antitrust claims unless Plaintiffs allege that ADM

depressed prices below a predatory level.

"Predatory pricing is a three-stage process: Low prices, followed by the exit of

producers who can no longer make a profit, followed by monopoly prices." *Wallace v.*

*Int'l Bus. Machines Corp.*, 467 F.3d 1104, 1106 (7th Cir. 2006).

"To make out a predatory-pricing claim, the plaintiff must establish not only that

the defendant has sold products below cost but also that exit from the market has

occurred or is imminent, enabling the aggressor to recoup by setting monopoly prices

that injure consumers." *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 695

(7th Cir. 2006); see also *Schor v. Abbott Labs.*, 457 F.3d 608, 613 (7th Cir. 2006) ("[T]he

Supreme Court [has] held that low prices are lawful, even if the seller has considerable

market power, unless rivals have been driven out of the market and recoupment is

either ongoing or imminent.").

In response to ADM's Motion to Dismiss, Plaintiffs argue that they have alleged

that "ADM's predatory pricing scheme was already causing competitors to idle some

plant[s] and would ultimately result in driving … Plaintiffs … out of the market…."

And, that ADM intended its scheme to drive competitors "like Plaintiffs" out of the ethanol market.

The court finds Plaintiffs' construction of their Complaint is unpersuasive. Plaintiffs' allegations of low prices and shuttered or partially shuttered plants are largely presented in the context of the condition of the ethanol market before and at the time that ADM's scheme began. Plaintiffs allege that in 2016 and 2017 falling ethanol prices in the United States were "squeezing or eliminating profit margins of ethanol producers" (ostensibly including ADM), causing them to idle plants or consider exiting the business altogether. Complaint ¶66. Plaintiffs allege ADM's scheme began "*even as* some of ADM's Producer-competitors cut production runs, shut down or idled plants, or sold ethanol plants due to slumping ethanol prices and margins." Complaint ¶69 (emphasis added). Plaintiffs allege this "would ultimately" drive competitors out of the market, but Plaintiffs do not point to concrete allegations of producers driven from the market due to ADM's scheme. Rather, largely, the Complaint shows that the ethanol market was already extremely tough and that producers (including ADM) were scrambling to make money off ethanol.

Plaintiffs argue that ADM has been able to recoup its losses from below-cost sales of physical ethanol at the Argo Terminal not by raising prices after excluding other competitors, but rather through its gains on short positions in the ethanol futures market. Plaintiffs argue this raises the specter of future "supra-competitive" prices and low output.

8

The Seventh Circuit has held that, in the case of certain commodities, "[t]he futures market and the cash market … are … so closely related that the distinction between them is of no consequence to antitrust standing analysis." *Sanner,* 62 F.3d at 929 (internal quotations omitted). Therefore, although the Complaint does not adequately allege increased ethanol prices, the court finds Plaintiffs' theory of recoupment is sufficient at this stage, even if it does not follow the traditional predatory pricing scheme.

However, the Complaint still does not plausibly allege that Plaintiffs have "been knocked out of the market or [are] in imminent danger of leaving," or that other ADM competitors "tried and failed to enter the marketplace" or already "exit[ed] the market." *R.J. Reynolds Tobacco*, 462 F.3d at 696; *VBR Tours*, 2015 WL 225328, at *5. Rather, Plaintiffs allege that they continued to make essentially the same sales they would have been making before ADM's scheme, just at further-depressed prices.

The Complaint does contain boilerplate language and general allegations that ADM's manipulation of prices caused market restrictions to the detriment of other ethanol producers. But boilerplate language is not a sufficient allegation of antitrust injury. See, e.g., *VBR Tours*, 2015 WL 225328, at *5 ("[T]he complaint states that [defendant]'s ability to underprice its competitors has created an 'insurmountable' barrier to entry, chilling competition, yet [plaintiff] provides no example of a potential competitor who tried and failed to enter the marketplace, nor does it cite to on[e] example of an existing competitor exiting the market. In the absence of any such information, the Court is left with general statements that [defendant] will cause

9

antitrust injury by reducing prices. General allegations of low prices are insufficient to state a claim.").

Plaintiffs argue that the complaint and other filings in *AOT Holding AG v. Archer Daniels Midland Co.*, case no. 19-CV-2240 (C.D. Ill.), which is a case brought pursuant to the federal Commodity Exchange Act ("CEA"), support their allegations of antitrust injury here. Again, however, Plaintiffs must allege *antitrust* injury, which is an "injury of the type the *antitrust* laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489 (emphasis added); see also *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."). Antitrust law is "designed to protect consumers from producers, not to protect producers from each other." *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996). Here, Plaintiffs may not rely on alleged violations of the CEA in order to allege antitrust injury sufficient to support its claims under the Clayton and Sherman Antitrust Acts.

Because the Complaint does not adequately allege antitrust injury, Plaintiffs' antitrust claims (Counts I-IV) are DISMISSED without prejudice.

ii. Monopoly Power

ADM argues that even if Plaintiffs had alleged an antitrust injury, Plaintiffs did not adequately plead that ADM has achieved monopoly power or that there is a dangerous probability of ADM achieving monopoly power.

10

To establish the first element of monopoly or attempted monopoly, the plaintiff must show that the defendant either possesses monopoly power in the relevant market or that there is a dangerous probability of the defendant achieving monopoly power.

A plaintiff may allege monopoly power in one of two ways:

> One is through direct evidence of anticompetitive effects. See *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis."). The other, more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case.

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). Plaintiffs argue they have properly alleged monopoly power by either means.

a. Direct Evidence of Anticompetitive Effects

Plaintiffs argue their Complaint alleges direct evidence of market power through anticompetitive effects. Specifically, the Complaint alleges that ADM artificially depressed prices at the Argo Terminal and decreased Chicago Ethanol Derivative Prices and other Benchmark Prices that are determined by the daily MOC window prices at the Argo Terminal. Plaintiffs argue they have alleged that ADM's conduct caused producers to idle plants and consider exiting the business altogether, and, combined with ADM's alleged intent to drive its competitors out of the market and cement its ability to raise prices, Plaintiffs say this is enough to show anticompetitive effects via predatory harm and, thus, show ADM has monopoly power.

However, as previously discussed, in the context of depressed prices "only predatory pricing has the requisite anticompetitive effect." *Atl. Richfield Co.*, 495 U.S. at 339. Because Plaintiffs have not adequately alleged predatory pricing, the Complaint does not allege direct evidence of anticompetitive effects.

b. Share of Relevant Market

Plaintiffs argue they have adequately alleged a relevant market in the "Argo Terminal Market." Plaintiffs allege ADM possessed market share of over seventy percent of the Argo Terminal Market, and over ninety percent of sales during the MOC window. Plaintiffs argue the Argo Terminal Market is a viable relevant market and argue ADM's dominance there is sufficient to show monopoly power.

ADM argues that Plaintiffs do not define a plausible relevant market. ADM contends the relevant market is the United States ethanol market, of which the Complaint only alleges ADM has ten percent. ADM points to Plaintiffs' allegations that ethanol is a commodity, which may be bought from any producer, and which may be bought at any storage terminal; that there are 1,200 storage terminals in the United States; that there are 200 ethanol plants in the United States which can produce over 14.6 billion gallons of ethanol per year (aside from ADM's capacity); that ethanol can be shipped from terminal to terminal and often is so shipped due to the variability of terminal prices; and that ethanol is routinely shipped out of the Midwest as a part of the ethanol production business. ADM also argues that even if the Argo Terminal were a viable market Plaintiffs have failed to allege barriers to entry in the Argo Terminal Market.

12

For antitrust claims a "market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011), citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956). Therefore, "the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *In re Dairy Farmers of Am.*, 767 F. Supp. 2d at 901.

However, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (7th Cir. 2001). District courts only dismiss antitrust claims based on inadequate market definition when "the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070-1071 (N.D. Ill. 2016); *In re Dairy Farmers of Am.*, 767 F. Supp. 2d at 901.

Here, Plaintiffs have plausibly explained the distinctive features of the Argo Terminal Market and the related MOC-based pricing formulas incorporated into Producer Sales Contracts. For example, paragraph 13 of the Complaint alleges:

> [T]he Argo Terminal is a critical point for ethanol price determination and although many Producer Sales are made outside of the Argo Terminal, the overwhelming majority of Producer Sales are made through Producer Contracts that include Formula Prices based on the Chicago Price Indexes. Thus, as ADM knew with substantial certainty when it developed and executed its illegal strategy, its downward manipulation of prices at the Argo Terminal distorted the proper functioning of the Argo Terminal

13

Market and the U.S. Ethanol Market, harming other market participants
who relied upon the proper functioning of the Chicago Price Indexes,
thwarting the proper operation of the Producer Sales Contracts ….

The court finds that, at this stage, before procedural rules allow for fact-intensive

inquiry, Plaintiffs have adequately proposed a relevant market for purposes of their

antitrust claims.

Plaintiffs must also allege ADM's share of the relevant market. See, e.g., *Walter*

*Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 902 (N.D.

Ill. 2009) (holding that allegation defendant controlled sixty-five percent of market is

sufficient at pleading stage to establish market share); *Am. Tobacco Co. v. United States*,

328 U.S. 781, 797 (1946) (describing the defendant's control of two-thirds of the market

as a "substantial monopoly"); *Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575,

*7 (N.D. Ill. Aug. 14, 2018) (collecting cases).

Plaintiffs allege that during the relevant period ADM controlled seventy percent

of sales at the Argo Terminal. The court finds these allegations adequately allege

ADM's share of the Argo Terminal Market.

Regarding the parties' disagreement as to whether Plaintiffs have adequately

alleged barriers to entry of the Argo Terminal Market, the court finds, based on the

unique position and structure of the Argo Terminal, Plaintiffs' allegations of barriers to

entry are sufficient at this early stage of the litigation.

Because the Complaint adequately alleges monopoly power by describing

ADM's share of a relevant market, ADM's dismissal motion is denied as to this basis.

c. Willful Acquisition of Power

The second element of a monopolization claim requires a defendant's "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71. This element is sometimes referred to as "anticompetitive conduct." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Regarding willful acquisition of power, "the precise boundaries of anticompetitive conduct are sometimes difficult to define, but '[i]f a firm has been attempting to exclude rivals on some basis other than efficiency,'" that can show anticompetitive conduct when assessing willful acquisition of power. *Ploss*, 197 F. Supp. 3d at 1073, quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).

The Complaint contains numerous allegations of uneconomic and financially irrational behavior by ADM, including shipping ethanol to Argo when prices at the Argo Terminal were already lower than those at other terminals; selling ethanol at the Argo Terminal for less than ADM's variable cost to produce or obtain the ethanol; selling during the MOC even when ADM did not have physical ethanol to deliver to satisfy the sales contracts; and purchasing ethanol at the Argo Terminal outside of the MOC for higher prices than it sold ethanol during the MOC.

Here, the allegations are of "conduct that, were it not intended to obtain or sustain monopoly power, would be uneconomic and irrational." *Ploss*, 197 F. Supp. 3d at 1073, quoting *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 487 (S.D.N.Y. 2016).

The court finds Plaintiffs have adequately pled that ADM pursued the willful acquisition of monopoly power.

iii. Conclusion as to Antitrust Claims (Counts I-IV)

The court finds Plaintiff has failed to adequately allege antitrust injury. ADM's dismissal motion is GRANTED, and Counts I-IV are dismissed, on that basis. Dismissal of Plaintiffs' Claims I-IV for failure to adequately allege antitrust injury is without prejudice.

ADM also argues that even if Plaintiffs had alleged antitrust injury, the Complaint should also be dismissed because it does not adequately allege monopolization or attempted monopolization claims. The court finds ADM's arguments unpersuasive. Plaintiffs' Complaint otherwise adequately alleges claims for monopolization and attempted monopolization.

2. *Illinois (Count V) and Wisconsin (Count VI) Consumer Fraud Claims*

i. Illinois Consumer Fraud and Deceptive Practices Act

To state an ICFA claim, a plaintiff must plead: "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the deception occurred in the course of trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury." *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 546 (Ill. 2006).

The ICFA is designed to protect "consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive trade practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). As such, "[t]he protections of the [IFCA] are not limited to consumers." *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370, 1376 (Ill. App. Ct. 1991).

Plaintiffs argue they have adequately alleged each element.

However, ADM argues in its Reply that an ICFA claim requires a plaintiff (be they an individual or a business entity) to allege a consumer harm that outweighs any consumer benefit, or to allege conduct by the defendant that misled consumers. See, e.g., *Tyler v. Bank of New York Mellon*, 2020 WL 2735367, at *8 (N.D. Ill. May 26, 2020) ("[plaintiff] cannot show that [defendant's] conduct caused substantial injury to consumers"). Plaintiffs have not provided any authority that contradicts this rule, nor did Plaintiffs even address this argument in their Surreply.

The only alleged possible harm to consumers is Plaintiffs' speculation that at some point ADM could exercise its market power to drive up ethanol prices. Plaintiffs have not provided any authority for an ICFA claim to proceed on such shaky allegations.

ADM's dismissal motion is GRANTED as to Plaintiffs' ICFA claim (Count V), which is DISMISSED without prejudice.

ii. Wisconsin Deceptive Trade Practices Act

To state a DTPA claim a plaintiff must allege "(1) the defendant made a representation to one or more members of the public with the intent to induce an

obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the

representation materially induced a pecuniary loss to the plaintiff." *Hinrichs v. Dow*

*Chem. Co.*, 937 N.W.2d 37, 56 (Wis. 2020).

Plaintiffs argue they have adequately alleged each element, and that there is no

prohibition on a commercial entity acting as a plaintiff under the DTPA. See *Stoughton*

*Trailers, Inc. v. Henkel Corp.*, 965 F. Supp. 1227, 1237 (W.D. Wis. 1997); *Gorton v. Am.*

*Cyanamid Co.*, 533 N.W.2d 746, 758 (Wis. 1995).

ADM argues in its Reply that although commercial entities may certainly serve

as DTPA plaintiffs, they must be the defendant's customers, not its competitors. Both

cases cited by Plaintiffs follow that rule, and Plaintiffs' Surreply does not contradict or

otherwise address ADM's argument on this point.

Plaintiffs have not alleged that they were ADM's customers (as opposed to

competitors), nor have they alleged any plausible consumer harm.

ADM's dismissal motion is GRANTED as to Plaintiffs' DTPA claim (Count VI),

which is DISMISSED without prejudice.

### 3. Iowa (Count VII) and Wisconsin (Count VIII) Tortious Interference Claims

To state a claim for tortious interference with contract under Iowa law, a plaintiff

must allege: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the

contract; (3) defendant intentionally and improperly interfered with the contract; (4) the

interference caused the third-party not to perform, or made performance more

burdensome or expensive; and (5) damage to the plaintiff resulted." *Jones v. Lake Park*

*Care Ctr.*, 569 N.W.2d 369, 377 (Iowa 1997) (citation omitted).

18

To state a claim for tortious interference with contract under Wisconsin law, a plaintiff must allege:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere.

*Briesemeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. Ct. App. 2006).

ADM argues Plaintiffs have failed to allege any specific contract for either cause of action and argue that failure requires dismissal of these claims. Plaintiffs suggest that they have alleged enough to meet the above elements, but also agree that they have not pled any specific contract and say they can identify specific contracts if allowed to replead.

The court finds Plaintiffs must allege specific contracts that ADM interfered with for these claims to move forward. See, e.g., *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 252-53 (S.D.N.Y. 2019) (dismissing Wisconsin tortious interference claims because they failed to identify a contract); *Criterion 508 Sols. v. Lockheed Martin Servs.*, 806 F. Supp. 2d 1078, 1100 (S.D. Iowa 2009) (an Iowa tortious interference claim requires a valid contract).

ADM's dismissal motion is GRANTED as to Plaintiffs' Iowa (Count VII) and Wisconsin (Count VIII) tortious interference claims, which are DISMISSED without prejudice.

IT IS THEREFORE ORDERED:

1)  Defendant's Motion to Dismiss (#12) is GRANTED.

2)  The Complaint (#1) is DISMISSED without prejudice. Plaintiffs have 21 days to file an amended complaint. If they do not do so, dismissal of the Complaint will be converted to dismissed with prejudice.

3)  This matter is referred to the Magistrate Judge for further proceedings consistent with this order.

ENTERED this 28th day of September, 2021.

<u>s/Colin Stirling Bruce</u>
COLIN S. BRUCE
U.S. DISTRICT JUDGE