## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **UNITED WISCONSIN GRAIN,** | ) | |
| **PRODUCERS LLC, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 20-CV-2314** |
| | ) | |
| **ARCHER DANIELS MIDLAND** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Plaintiffs United Wisconsin Grain Producers LLC, Didion Ethanol, LLC, Ace Ethanol, LLC, Fox River Valley Ethanol, LLC, Badger State Ethanol, LLC, and PLCP, LLLP, filed a Complaint (#1) against Defendant Archer Daniels Midland Company ("ADM"), alleging that ADM violated Section 2 of the Sherman Antitrust Act. See 15 U.S.C. § 2. Plaintiffs also raised a number of claims arising under the laws of Illinois, Wisconsin, and Iowa. ADM filed a Motion to Dismiss (#12), which this court granted (#32) on September 28, 2021.

On October 19, 2021, Plaintiffs filed an Amended Complaint (#36). Presently before the court is ADM's Motion to Dismiss (#42) the Amended Complaint for failure to state a claim, filed on December 9, 2021. Plaintiffs filed a Response (#45) on January 20, 2021; ADM filed a Reply (#49) that was docketed on June 2, 2022; and Plaintiffs filed a Sur-Reply (#52) that was docketed on June 28, 2022. For the reasons set forth below,

ADM's Motion to Dismiss (#42) is granted with respect to Counts I through IV of the Amended Complaint. The court relinquishes jurisdiction over, and thus dismisses without prejudice, Counts V through VII of the Amended Complaint.

## BACKGROUND

The following background facts are taken from the allegations in Plaintiffs' Amended Complaint. For purposes of ruling on the Motion to Dismiss, the court assumes to be true all well-pled factual allegations in the Complaint and any inferences that can reasonably be drawn therefrom. See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

*The Amended Complaint*

At the outset, the court notes that, with important exceptions discussed below, the allegations contained within the Amended Complaint—and the claims derived therefrom—are largely identical to those in the original Complaint. Thus, the court's detailed description of the original Complaint, set forth is its prior order of dismissal, remains relevant.

Plaintiffs allege in their Amended Complaint that ADM engaged in monopolization (Count I) and attempted monopolization (Count II) in violation of Section 2 of the Sherman Antitrust Act. See 15 U.S.C. § 2. Plaintiffs bring similar claims (Counts III and IV) under parallel provisions of the Illinois Antitrust Act. See 740 Ill. Comp. Stat. 10/3(3). Finally, Plaintiffs allege violations of the Illinois Consumer Fraud and Deceptive Practices Act (815 Ill. Comp. Stat. 505/1 et seq.) (Count V) and tortious interference with contract under Iowa (Count VI) and Wisconsin (Count VII) law. A

claim of violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18) was previously dismissed by this court and has not been reraised in the Amended Complaint.

Plaintiffs allege that ADM engaged in unlawful conduct intended to depress the price of ethanol. Specifically, Plaintiffs' allegations relate to ADM's conduct in the ethanol terminal in Argo, Illinois ("Argo Terminal"). Trading for ethanol at the Argo Terminal during the half-hour "Market-on-Close" ("MOC") period each trading day determines the Chicago Benchmark Price created by S&P Global Platts. The Chicago Benchmark Price, in turn, sets the value of Chicago Ethanol Derivatives traded on the Chicago Mercantile Exchange. Trades at the Argo Terminal are also used by the Oil Price Information Service ("OPIS") in its reports of daily Chicago OPIS Prices. Plaintiffs sell ethanol primarily pursuant to Producer Sales Contracts that specify prices in a formula based on the Chicago Benchmark Price, Chicago Ethanol Derivatives Prices, or Chicago OPIS Prices—all of which are determined to some extent by sales prices at the Argo Terminal during the MOC window.

Beginning on November 17, 2017, until an unknown date in at least mid-2019, ADM became a prolific seller during the Argo Terminal's MOC window, "flooding" Argo with ethanol that it intentionally sold at uneconomically low prices. ADM's conduct included uneconomically buying and shipping ethanol to Argo when the prices at the Argo Terminal were already lower than those at other terminals; selling ethanol at the Argo Terminal for less than ADM's variable cost to produce or obtain the ethanol; selling during the MOC window even when ADM did not have enough physical

ethanol to deliver to satisfy the sales contracts; and aggressively reducing its prices during the MOC window to capture 90 to 100 percent of sales in that period. The Amended Complaint further alleges that ADM controlled seventy percent of the overall Argo Terminal Market.

Plaintiffs allege that ADM funded its operation through outsized short positions in ethanol. A short position is a trading position where a derivative investment earns money for a trader if the price of the underlying commodity decreases. By reducing prices at the Argo Terminal during the MOC window, thereby decreasing the Chicago Ethanol Derivative Prices, ADM created substantial gains on its short positions in Chicago Ethanol Derivatives, sufficient to compensate ADM for its sales losses incurred at Argo, with profit to spare. Plaintiffs incurred losses when they sold ethanol pursuant to Producer Sales Contracts in which prices were based on a formula incorporating the depressed MOC window ethanol prices from the Argo Terminal.

Plaintiffs also provide numerous allegations regarding ethanol and the United States ethanol market generally. The total ethanol production capacity in the U.S. is nearly 16.3 billion gallons. ADM produces approximately 10% of the ethanol in the U.S. Of the 200 ethanol plants in the U.S., 176 are located in the Midwest, and "[s]hipping ethanol out of the Midwest for sale in other regions is therefore a routine part of the ethanol production business." There are more than 1,200 ethanol terminals in the country, with the Argo Terminal being one of the largest.

*Prior Order of Dismissal*

In its first Motion to Dismiss, ADM argued, inter alia, that the original Complaint was insufficient because Plaintiffs had failed to allege that ADM's conduct had caused competing ethanol producers to leave the market.

This court observed in its Order that because the alleged antitrust injury was based upon *low* prices, Plaintiff was required to allege that ADM engaged in predatory pricing, and that one element of a predatory pricing scheme is the actual or imminent exit from the market by producers who can no longer make a profit.

The court, quoting *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 696 (7th Cir. 2006), found that Plaintiffs had failed to make the required allegations, observing that "the Complaint still does not plausibly allege that Plaintiffs have 'been knocked out of the market or [are] in imminent danger of leaving,' or that other ADM competitors 'tried and failed to enter the marketplace' or already 'exit[ed] the market.' The court concluded that Plaintiffs' failure to make "concrete allegations of producers driven from the market due to ADM's scheme" rendered them unable to properly allege an antitrust injury, and was therefore fatal to their antitrust claims.

While that finding was sufficient to dismiss Plaintiffs' antitrust claims, the court went on to address the other grounds on which ADM claimed the original Complaint was insufficient.

As relevant to the instant Order, ADM asserted in its first Motion to Dismiss that Plaintiffs had failed to sufficiently allege that ADM had monopoly power, or that there existed a dangerous probability of ADM achieving such power, in a legally viable

market—another required element of Plaintiffs' antitrust claims. To wit, ADM pointed out that, per Plaintiffs' own allegations, it only held a roughly 10% share of the U.S. ethanol market.

In response, Plaintiffs argued that they had "alleged sufficient circumstantial evidence that ADM possessed market power at the Argo Terminal Market." In support, Plaintiffs pointed out that they alleged ADM possessed a market share of over 70% of the Argo Terminal Market and over 90% of the sales during the MOC window. Concluded Plaintiffs: "This is sufficient to allege monopoly power."

This court rejected ADM's argument, finding that Plaintiffs had alleged "the distinctive features of the Argo Terminal Market and the related MOC-based pricing formulas incorporated into Producer Sales Contracts." Moreover, the court pointed out that market definition is a deeply fact-intensive inquiry and that Plaintiffs had adequately proposed a relevant market at the motion to dismiss stage.

Ultimately, the court dismissed without prejudice Counts I through IV of Plaintiffs' original Complaint solely on the grounds that Plaintiffs had failed to allege that other ethanal producers had exited, or would imminently exit, the market. The court affirmatively found that Plaintiffs' monopolization and attempted monopolization claims were sufficient in every other regard, including Plaintiffs' allegations of the Argo Terminal Market as a legally viable market.

*New Allegations*

The lone shortcoming in the original Complaint found by this court in its prior Order—the lack of allegations of producers exiting the market—is addressed in Paragraph 91 of the Amended Complaint. That paragraph alleges that in or around November 2018, approximately one year after ADM began its scheme:

(1) Green Plains Hopewell LLC "permanently closed" a 60 million gallon-per-year capacity ethanol plant in Hopewell, Virginia;

(2) Green Plains Inc. "announced its intent to suspend operations" at a 119 million gallon-per-year facility in Fairmont, Minnesota;

(3) Little Sioux "cut in half" its 135 million gallon-per-year production at its Marcus, Iowa plant; and

(4) Diamond Ethanol, LLC, a subsidiary of Conestoga Energy Holdings LLC "halt[ed] production" at its 40 million gallon per year Levelland Texas plant.

Plaintiffs also allege in Paragraph 91 that in or around December 2019:

(5) Ergon Biofuels LLC, located in Vicksburg, Mississippi, "permanently shut its 54 million gallon per year ethanol capacity [*sic*]";

(6) Pacific Ethanol "shut down" a portion of its ethanol plant in Aurora, Nebraska, amounting to a reduction in output of 45 million gallons per year;

(7) Green Plains Inc. "announced plans to idle" a 55 million gallon-per-year plant in Fergus Falls, Minnesota, for up to one and a half years;

Additionally, Plaintiffs allege:

(8) In April 2019, Marquis Energy announced that it had terminated its plans to build a $500 million ethanol plant near Bluffs, Illinois;

(9) In or around July 2019, Plymouth Energy "shut down" a 50 million gallon-per-year plant in Merrill, Iowa;

(10) Around the same time, Central Minnesota Renewables LLC began to "wind-down" and eventually closed its 21 million gallon-per-year ethanol plant in Little Falls, Minnesota;

(11) In or around August 2019, POET "announced plans to permanently shut down" a 92 million gallon-per-year plant in Cloverdale, Indiana;

(12) In or around August 2019, POET "announced it would trim operations at about half of its remaining 27 ethanol plants";

(13) In or around August 2019, Marquis Energy "announced that it would cut ethanol output" at a 100 million gallon-per-year plant in Necedah, Wisconsin;

(14) In or around August 2019, Corn Plus Cooperative "announced it was shutting down" a 48 million gallon-per-year plant. Corn Plus has since announced a plan to restart the plant;

(15) In early November 2019, Valero Renewable Fuels Co. LLC – Riga closed its 60 million gallon-per-year plant in Blissfield, Michigan, "with no plans to reopen"; and

(13) In early November 2019, Valero closed its 120 million gallon-per-year Bluffton, Indiana ethanol plant "until more 'favorable economic conditions'" return to the market.

## ANALYSIS

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 545. In ruling upon a motion to dismiss, the court must draw all reasonable inferences in favor of the plaintiff but need not accept as true any legal assertions, threadbare recitals of the elements of a cause of action, or conclusory statements. See *Iqbal*, 556 U.S. at 678.

In its current Motion to Dismiss, ADM argues that the Amended Complaint still does not sufficiently allege an antitrust injury because it still has not properly alleged that other ethanol producers exited the relevant market.[1] ADM's specific arguments are discussed in further detail below.

---

[1] ADM also argues that Plaintiffs have failed to allege in their Amended Complaint that ADM ever charged monopoly prices for ethanol, insisting that such conduct is a necessary element of a predatory pricing scheme. This court previously rejected this argument, finding the original Complaint sufficient in this regard. ADM

*General Antitrust Principles*

Private civil actions to enforce the Sherman Antitrust Act are allowed under the Clayton Act, 15 U.S.C. § 15. *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 926 (7th Cir. 1995). As this court observed in its prior Order, the legal standards controlling federal antitrust law and Illinois antitrust law are the same. See 740 Ill. Comp. Stat. 10/11 ("When the wording of this [Illinois Antitrust] Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."). Accordingly, claims under the Illinois Antitrust Act "will stand or fall with federal … claims based on the same underlying facts and legal theories." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 225328, at *16 (N.D. Ill. Jan. 15, 2015); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 989-90 (Ill. 1990). The court will therefore consider Counts I through IV of the Amended Complaint in conjunction with one another.

*Antitrust Injury*

To recover under the Sherman Antitrust Act and the Clayton Act, a plaintiff must first prove "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). At this stage of the

---

concedes that this argument is, at bottom, a request that this Court reconsider its previous ruling on the matter. Because the court dismisses the Amended Complaint on other grounds, it need not reach this argument or reconsider its prior ruling.

proceedings, Plaintiffs must plausibly plead the existence of an antitrust injury. *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010).

The lowering of prices may create an antitrust injury where it crosses the line from price cutting aimed simply at increasing market share to predatory pricing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 118 (1986). The Supreme Court has defined predatory pricing as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Id.* at 117. Because the end goal of predatory pricing is the elimination of competition, it is a practice "inimical to the purposes of [the antitrust] laws" and capable of inflicting antitrust injury. *Id.* (quoting *Brunswick*, 429 U.S. at 488).

"Predatory pricing is a three-stage process: Low prices, followed by the exit of producers who can no longer make a profit, followed by monopoly prices." *Wallace v. IBM Corp.*, 467 F.3d 1104, 1106 (7th Cir. 2006). In order to sufficiently plead an antitrust injury based on predatory pricing, a plaintiff must adequately allege "not only that the defendant has sold products below cost but also that exit from the market has occurred or is imminent, enabling the aggressor to recoup by setting monopoly prices that injure consumers." *R.J. Reynolds Tobacco*, 462 F.3d at 95; see also *Schor v. Abbott Labs.*, 457 F.3d 608, 613 (7th Cir. 2006) ("[T]he Supreme Court [has] held that low prices are lawful, even if the seller has considerable market power, unless rivals have been driven out of the market and recoupment is either ongoing or imminent.").

In the Amended Complaint, Plaintiffs identify at least 11 ethanol producers that stopped ethanol production in a plant (either temporarily or permanently), decreased ethanol production, or terminated plans to build a new ethanol plant.

The Parties' Market Exit Arguments

ADM observes that the Amended Complaint contains no allegation that any of those producers ever brought any ethanol to the Argo Terminal—the market that this court previously found had been adequately pled by Plaintiffs. ADM concedes that it is surely *conceivable* that some of the ethanol at those plants previously made its way to Argo, but asserts that a complaint must make factual allegations that "nudge[ its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In their Response, Plaintiffs state: "To reach this conclusion, ADM ignores the relevant market alleged by Plaintiffs, the U.S. Ethanol Market. In fact, ADM never even mentions the defined U.S. Ethanol Market. Instead, ADM discusses only the Argo Terminal Market[.]" Plaintiffs further assert that this court, in its prior Order, approved their market definition, i.e., "the entire U.S. ethanol market." Plaintiffs insist that while the Argo Terminal market was the actual site of ADM's conduct, the ultimate goal was the reduction of ethanol prices in the U.S. market generally, through the Argo Terminal's unique role in the price-setting system. Left implicit in Plaintiffs' Response is that the ethanol producers discussed in Paragraph 91 of the Amended Complaint surely exited the U.S. ethanol market. Plaintiffs make no argument that those producers exited the Argo Terminal market or that the Amended Complaint plausibly states such a fact.

In its Reply, ADM points out, again, that this court previously found that the Argo Terminal Market was properly pled as the relevant market. Moreover, ADM notes that this court actually rejected ADM's argument that the U.S. ethanol market was the appropriate market. ADM concludes:

> "Plaintiffs' argument now—that they alleged, and the Court found adequately pleaded, a relevant market of the U.S. ethanol market—has things exactly backwards. The only relevant market that the Court held was adequately pleaded was the Argo Terminal Market. And the amended complaint's market allegations are exactly the same as the original complaint's."

Finally, in their Sur-Reply, Plaintiffs accuse ADM of "attempt[ing] to confuse the issues before the Court." From there, Plaintiffs note that—in both the original and the Amended Complaint—they alleged that "ADM had monopoly power in the U.S. Ethanol Market as evidenced by its ability to control the prices therein." Further, they insist that the court "approved" their market allegations. Plaintiffs agree that the market allegations are "virtually identical" between the original and Amended Complaints. However, they maintain that "the Court has already found [that] by leveraging its power in the Argo Terminal Market, ADM possessed market power over U.S. Ethanol Market pricing."

### Sufficiency of Market Exit Allegations

The threshold dispute between the parties concerns from which market Plaintiffs must allege other ethanol producers exited: the Argo Terminal market, or the U.S. ethanol market generally. This court addressed Plaintiffs' pleading of a relevant market in its prior order, though in a different context. Resolution of the instant dispute requires revisitation of that analysis.

Plaintiffs' monopolization and attempted monopolization claims require them to plead and eventually prove that ADM has monopoly power in the relevant market or that there is a dangerous probability of ADM achieving such power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Monopoly power may be proven either through direct evidence of anticompetitive effects or, more conventionally, through inference from evidence of a dominant share of a relevant geographic market. *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000).

In response to ADM's original Motion to Dismiss, Plaintiffs argued that they had sufficiently alleged monopoly power (or a dangerous probability thereof) through either method. With respect to anticompetitive effects, Plaintiffs pointed out that they alleged ADM had depressed ethanol prices though manipulation of the Chicago Benchmark Price via the MOC window at Argo, and that ADM's conduct had caused ethanol producers to idle their plants or consider leaving the market altogether. The court summarily rejected this argument on the same grounds that it rejected Plaintiffs' antitrust injury argument, namely, because they had failed to allege that any specific producers had exited the market.

Plaintiffs argued that they had nevertheless sufficiently alleged monopoly power through evidence of market share, pointing out that they "alleged that ADM possessed a market share of over 70% of the Argo Terminal market [and] over 90% of the sales in the MOC Window." See *MCI Communications Corp. v. Amer. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) ("Where that data reveals a market share of more

than seventy to eighty percent, the courts have inferred the existence of monopoly power").

ADM argued that the Argo Terminal Market could not plausibly be considered a legally viable market for purposes of showing monopoly power. In short, it argued that it could not be said to have "monopoly power" over a single terminal, given that there are over 1,200 other ethanol terminals in the country and that ethanol is routinely transported from one terminal to another. ADM argued that the only relevant market was the U.S. ethanol market, and that Plaintiffs were unable to allege monopoly power in that market, given that, per the original Complaint, ADM produces only 10 percent of the ethanol in the United States.

The court agreed with Plaintiffs. It found that Plaintiffs had adequately proposed a relevant market at the Argo Terminal. Further, the court found that Plaintiffs' allegations that ADM controlled 70 percent of the sales at Argo amounted to a sufficient allegation of market share from which monopoly power could be inferred.

Plaintiffs' current position—that this court previously found they had adequately alleged the U.S. ethanol market as the relevant market—is plainly refuted by the court's prior order and by the parties' arguments in advance thereof. Indeed, Plaintiffs clearly and explicitly argued the Argo Terminal market was the relevant market and the court adopted that argument. Accordingly, in order to satisfy the antitrust injury requirement, Plaintiffs are required to plausibly allege that other ethanol producers exited or would imminently exit *that* market.

Plaintiffs have failed to make such an allegation. There is no allegation that any of the producers referenced in Paragraph 91 ever brought ethanol to the Argo Terminal, such that the allegations in that Paragraph could be construed as an exit from that market. Indeed, as mentioned above, Plaintiffs do not actually argue that the allegations in their Amended Complaint adequately allege any exit from the Argo Terminal market.

To be sure, it is not inconceivable that some of the ethanol produced by the now-shuttered plants was brought to market at Argo. But in order to be deemed sufficient at this stage, a complaint must make factual allegations that "nudge[ its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Per the Amended Complaint, there are more than 200 ethanol plants and more than 1,200 ethanol terminals nationwide. While many of the plants identified in Paragraph 91 are (or were) located in the Midwest, the Amended Complaint also alleged that "[s]hipping ethanol out of the Midwest for sale in other regions is . . . a routine part of the ethanol production business." The bare fact that some of the ethanol from closed plants might possibly have passed through the Argo Terminal is insufficient. See *Twombly*, 550 U.S. at 570.

Accordingly, even assuming that the conduct described in Paragraph 91 could be construed as a market exit, Plaintiffs have failed to allege facts from which this court could reasonably infer that producers exited the Argo Terminal market. Plaintiffs have therefore failed to adequately allege an antitrust injury based on predatory pricing. See *R.J. Reynolds Tobacco*, 462 F.3d at 95.

*Relevant Market*

At this point, the court notes that Plaintiffs have made no request that the court revisit or reconsider its prior order, in which it found they adequately alleged the Argo Terminal market as the relevant market. Rather, Plaintiffs double down on their insistence that this court's prior Order reaches the very opposite conclusion than the one it actually does. This seems to be an attempt by Plaintiffs to have their cake and eat it too: insist for purposes of pleading monopoly power that the relevant market is the Argo Terminal market, then argue for antitrust injury/market exit purposes that the relevant market is actually the U.S. ethanol market. Nevertheless, and in the interest of a complete analysis, the court will consider the result where—contrary to the prior order—the U.S. ethanol market is considered the relevant market.

First, even if Plaintiffs' new allegations satisfy the market exit requirement with respect to the U.S. ethanol market, Plaintiffs are unable to sufficiently plead that ADM has monopoly power in that market. As ADM pointed out in its original Motion to Dismiss, Plaintiffs allege that ADM produces 10% of U.S. ethanol, a far cry from monopoly power in that market. Neither in their original response nor in their current filings have Plaintiffs ever argued that they have adequately pled that ADM's share of the U.S. ethanol market was indicative of monopoly power, and this court can discern no apparent basis to conclude otherwise. See *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share.").

Second, when the U.S. ethanol market is considered as a whole, the "market exits" described in Paragraph 91 are considerably less compelling.

Up to this point, the court has treated the individual allegations in that paragraph as equally relevant, assuming, *arguendo*, that they all describe market exits. However, half of the 16 total allegations in that paragraph describe either output reductions at plants or shutdowns that were explicitly temporary in nature. On their face, these cannot be described as exits from the U.S. ethanol market. That conclusion is bolstered when one considers the context in which the requirement arises. Recall that a predatory pricing scheme follows a three-step process: "Low prices, followed by the exit of producers who can no longer make a profit, followed by monopoly prices." *Wallace*, 467 F.3d at 1106. Axiomatically, it is the lack of competition that enables the monopoly prices. Ethanol producers who have only dialed back production, or temporarily suspended production (while waiting for prices to rise), would have brought ADM no closer to the end goal of predatory pricing scheme.

Even allegations of permanent closures of ethanol plants do not themselves imply an exit from the market, as the law is concerned with producers, not plants. As the Amended Complaint illustrates, a firm may operate more than a single ethanol plant. For instance, Plaintiffs allege that POET "announced plans"[2] to permanently close an ethanol plant. In the next line, it is alleged that POET would "trim operations" at its

_____

[2] It is worth noting that some of the allegations in Paragraph 91 are couched in terms of the "announcement" of "plans" in 2018 or 2019. In some instances, the Amended Complaint—filed on October 19, 2021—makes no allegations concerning the actual implementation of those plans.

remaining 27 plants. Surely POET cannot be said to have exited the U.S. ethanol market. In fact, the Amended Complaint lacks any concrete allegations that any ethanol producer actually stopped selling ethanol in the U.S. market.

Finally, the court notes that even if every allegation of a permanently shuttered plant is construed as an "exit" from the U.S. ethanol market, that would amount to a capacity reduction of 375 million gallons per year, or slightly more than 2 percent of the 16.3 billion gallon-per-year production capacity of the U.S. ethanol market. Given such a minimal impact on the market, now two to three years removed from ADM's conduct, Plaintiffs have failed to plausibly allege a market exit that would give rise to a reasonable prospect of ADM imposing monopoly prices. See *R.J. Reynolds*, 462 F.3d at 695; *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 243 (1993) ("[Defendant] had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit.").

In summary, Plaintiffs have failed to allege that any producers of ethanol left the Argo Terminal market. Accordingly, where that market is considered the relevant market, Plaintiffs have failed to sufficiently plead an antitrust injury, as required to support their claims in Counts I through IV. Likewise, where the U.S. ethanol market is considered the relevant market, Plaintiffs have failed to adequately allege monopoly power, a dangerous probability of achieving monopoly power, or an antitrust injury. Counts I through IV of the Amended Complaint (#36) are therefore DISMISSED.

*Remaining State Court Claims*

Plaintiffs' remaining claims— violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V) and tortious interference with contract (Counts VI and VII)—each arise under state laws.

 The Court has subject matter jurisdiction over Plaintiffs' federal antitrust Claims (Counts I and II) pursuant to 28 U.S.C. §§ 1331 and 1337. The court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.[3] Where the district court has dismissed all claims over which it has original jurisdiction, it "may decline to exercise supplemental jurisdiction" over the remaining claims. 28 U.S.C. § 1367(c)(3). When all federal claims in a suit are dismissed before trial, there is a presumption that the court will, absent unusual circumstances, relinquish supplemental jurisdiction over the state law claims. *RWJ Management Co., Inc. v. BP Products North America, Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).

In the instant case, the court has exercised its supplemental jurisdiction with respect to Plaintiffs' claims under the Illinois Antitrust Act (Counts III and IV) because those claims rise and fall with their federal analogs (Counts I and II). *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("If the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter to the state court.").

---

[3] Plaintiffs make no allegation that this court has diversity jurisdiction under 28 U.S.C. § 1332. See *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 634 (7th Cir. 2021) ("The party invoking diversity jurisdiction (most often the plaintiff) bears the burden of showing its existence.").

However, while the presumption in favor of relinquishment is overcome with respect to Counts III and IV, for the reasons stated in *Wright*, that presumption is not overcome with respect to the remaining three claims. Thus, in the absence of any unusual circumstances and in an exercise of this court's discretion, the court declines to exercise supplemental jurisdiction over Counts V, VI, and VII of Plaintiffs' Amended Complaint, which are dismissed without prejudice.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Dismiss (#42) is GRANTED with respect to Counts I, II, III, and IV of the Amended Complaint (#36).

(2) Counts I, II, III, and IV of the Amended Complaint (#36) are DISMISSED with prejudice.

(3) Counts V, VI, and VII of the Amended Complaint (#36) are DISMISSED without prejudice.

(4) This matter is terminated.

ENTERED this 12th day of July , 2022.

s/Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE